## METROPOLITAN BANK *v.* ST. LOUIS DISPATCH COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

No. 224. Argued April 20, 1893.—Decided May 10, 1893.

Courts of equity in cases of concurrent jurisdiction, consider themselves bound by the statutes of limitation which govern actions at law.

A suit in equity to enforce a mortgage of the plant and good will of a newspaper published in Missouri, and of the accompanying membership in the Western Associated Press, which is commenced eight years after the right of action accrued, during which period the property had changed hands, and the original plant had been used up and new matter put in its place, is barred by the statute of limitations of that State, so far as it rests upon the theory of conversion of the properties by the defendant; and, so far as it proceeds upon the theory that the plant, the good will and the membership ought on equitable principles to be held subject to the lien of the mortgage, a court of equity must decline to assist a complainant who sleeps so long upon his rights, and shows no excuse for his laches.

THE Metropolitan National Bank of New York filed its bill of complaint against the St. Louis Dispatch Company, a cor-

poration organized under the laws of the State of Missouri; the Dispatch Publishing Company, a corporation likewise organized under the laws of that State, and H. L. Sutton, trustee, a citizen of Missouri, July 1, 1887, and an amended bill, April 21, 1888, which averred: "That on or about the first day of June, A.D. 1877, the said 'The St. Louis Dispatch Company' owned a certain daily evening newspaper in the city of St. Louis known as the 'St. Louis Dispatch,' and no other property whatsoever unconnected with and not appurtenant to the publication and operation of said newspaper; that the said 'The St. Louis Dispatch,' a newspaper, had been published continuously and daily for many years, to wit, since on or about the year 1852, and continued to be published daily excepting Sundays, up to the date hereinafter mentioned; that the said 'The St. Louis Dispatch,' a newspaper, was on the first day of June, A.D. 1877, a fully equipped journal, having a building under lease, all the machinery, type, presses, cases, forms, paper, furniture and tools useful or necessary for the printing and publishing of the same, a good circulation and advertising patronage, (known as its good will,) and a share of stock, in the Western Associated Press, under which it was entitled to receive telegraphic news and dispatches collected from all parts of the world, as hereinafter more particularly set forth."

That on said first day of June the St. Louis Dispatch Company, by deed of trust in the nature of a mortgage, duly recorded, conveyed to Henry L. Sutton as trustee the following-described property: The machinery, type, presses, cases, furniture, paper, forms and tools, together with the good will of the St. Louis Dispatch Company and its franchises of every kind and description, rights, privileges, and property, including its interest in the Western Associated Press, and any and all shares by it owned in the Western Associated Press; as also all accounts and choses in action or other valuable things by it owned or to it belonging wherever situated; as "also all other property of every other nature and character which the said party of the first part may acquire during the existence of this deed of trust;" to secure the payment of a note, dated

that day, to the order of Frank J. Bowman for the sum of $15,000, payable two years and six months after date, with interest at nine per cent per annum, payable one and one-half per cent on the first days of August, October, December, February, April, and June of each year until the payment of the principal sum; which note so secured was negotiated for value, and complainant became the legal holder thereof for value before maturity.

That at the time of the execution of said mortgage the Western Associated Press was a corporation organized under the laws of the State of Michigan, the sole purpose and object of its existence being "to procure intelligence for the newspaper press from all parts of the world, by telegraph, express, mail, or otherwise; and membership in said association was and is limited generally and specifically to owners and proprietors of newspapers and publishers of periodicals."

That at that date and prior thereto the St. Louis Dispatch Company was the legal owner on the books of the Western Associated Press of one share of stock, so called, in said association, (which was of great value,) represented by a certificate of membership, No. 38, which was upon the execution of the mortgage placed in the possession of the trustee with the following endorsement: "The within certificate of stock is hereby assigned and transferred to Henry L. Sutton, trustee in deed of trust bearing date June 1st, 1877, for like purposes as other property therein named is transferred, being the certificate of stock in the Western Associated Press therein referred to."

The bill then stated that on February 2, 1878, the St. Louis Dispatch Company made a second mortgage, conveying all of the property described in the first, and other property subsequently acquired, to a trustee in trust to secure another loan made by it, which was duly recorded, and under which a sale of the property took place December 9, 1878, (the sale so made being subject to the first mortgage,) one Arnold being the purchaser, who on the same day transferred it to Joseph Pulitzer.

That at the time of the sale, John A. Dillon was the owner

and publisher of a certain newspaper known as the "Evening Post," and was printing and publishing the same in the city of St. Louis; that the Post was the rival and competing newspaper with the Dispatch; and did not, nor did Dillon, own a membership in the Western Associated Press, nor any right to the telegraphic news and dispatches thereof; that neither the Post nor Dillon, in the business of carrying on and publishing the Post, had any presses, type, or paraphernalia for the printing or publication of a newspaper; that the Post had not been established but a few months before the said sale of the Dispatch newspaper, and had nothing of value, nor had the said Dillon, in connection with said publication, excepting a small circulation and advertising patronage and the name of the Post.

That on December 10, 1878, the said Dillon and the said Pulitzer consolidated the Post and the Dispatch, and on that day published a consolidated paper under the name of the "Post-Dispatch," and that Dillon acquired whatever interest in the Dispatch property came to him with full notice of the lien of the first mortgage and subject thereto.

It was further averred that on December 11, 1878, the "Dispatch Publishing Company" was organized as a corporation under the laws of Missouri, the object of which was the publication of a newspaper to be known and called the "Post and Dispatch;" that on that day, Pulitzer and Dillon, having consolidated the two papers, transferred the same to the Dispatch Publishing Company, which took the same subject to the mortgage on all the property of the "St. Louis Dispatch Company," and with full knowledge thereof; that thereupon, on the same day, the defendant, the Dispatch Publishing Company, entered into the possession of the building theretofore occupied by the St. Louis Dispatch Company in the publication of the St. Louis Dispatch, and of the good will of that newspaper, with the presses, type, etc., and all the rights, property, and franchises thereof, including the membership in the Western Associated Press represented then by certificate No. 38; that the Dispatch Publishing Company has ever since had the good will of the Dispatch Company, and the name

" Dispatch," and used the same building formerly occupied by the St. Louis Dispatch Company. The bill further alleges that the Dispatch Publishing Company paid the interest on the Bowman note on the first days of February, April, June and October, 1879, but the remaining instalment, payable on December 1, 1879, being the date on which the principal became due, they refused to pay, as also the principal; that upon such refusal the trustee, Sutton, demanded of the Dispatch Publishing Company the property of the St. Louis Dispatch Company, including its good will and all the property recited in the first mortgage, which the Dispatch Publishing Company wholly refused to surrender. That at that time the Dispatch Publishing Company had alienated, destroyed, or gradually used up all the machinery, type, presses, and property of a perishable nature of the St. Louis Dispatch Company.

The bill also averred that the good will of the St. Louis Dispatch newspaper was its chief element of value; that the good will so acquired by the Dispatch Publishing Company, of the St. Louis Dispatch Company, has been in the constant use and control of the first-named company, and has never been alienated; that the name of a newspaper is valuable and salable, and that the Dispatch Publishing Company acquired its name under the second mortgage, subject to the lien existing upon it, and still retains the name, " Dispatch," in the publication of its newspaper.

That the machinery, presses, etc., acquired by the purchase under the second mortgage by the Dispatch Publishing Company, it continued to use for a long time, but substituted new paraphernalia for publication from time to time, and that on the date of the maturity of the note the Dispatch Publishing Company had none of the original paraphernalia described in the first deed of mortgage; that the effect of the acquisition of the two properties known as the Evening Post and the St. Louis Dispatch was that the lien of the first mortgage attached to all the property of the Dispatch Publishing Company, and that the latter recognized the validity of the mortgage lien by paying the interest on the mortgage

debt and the assessment on the membership in the Western Associated Press; that the complainant and the trustee were induced by its conduct to believe that the Dispatch Publishing Company would pay the debt or surrender the property in case of a failure of compliance with the conditions of the trust deed; that the Dispatch Publishing Company continued to recognize the mortgage as a lien on said property, including the membership, up to the maturity of the note, when it refused to pay the same or surrender the property; that, for the reason that the good will and other property of the mortgagors was confused and intermingled with the property of the Dispatch Publishing Company so as to be incapable of separation or distinction therefrom, the property and good will of the latter ought in equity to be charged with the lien of the mortgage debt; and that at the time of the acquisition of said mortgaged good will, etc., the Dispatch Publishing Company agreed and assumed to pay said debt.

The bill further averred " that a membership in the Western Associated Press is always represented by a certificate of a share of stock therein, and that under the by-laws and constitution of said Western Associated Press, said membership is tenable and vendible only in connection with the publication of a newspaper or periodical, and in the manner laid down in the said constitution and by-laws which are herewith filed and made a part of this complaint and marked Exhibits F & G." And further, " that under the by-laws and articles of incorporation aforesaid, the legal title to said certificate of membership aforesaid could never have vested fully in any individual, firm or corporation until, and after said individual, firm or corporation should have become the purchaser of the good will and property of said St. Louis Dispatch Company and as successor in right and liability to said company; and if, after any sale whether of foreclosure or otherwise, the purchaser of said property did not continue a publication in connection therewith, the said membership would become lifeless and valueless because a publication in connection with it was and is necessary to the sustenance of its life and value; that the said trustee and complainant herein have no rights in

respect to said membership, except under said deed of trust, and can acquire no title thereto until a sale of the good will of the St. Louis Dispatch Company, now in possession of the defendant Dispatch Publishing Company, at which time the title intended to be conveyed to the complainant herein by said deed of trust would be effectuated to the purchaser of the good will and property of said St. Louis Dispatch Company."

That one year after the Dispatch Publishing Company had been in the use and enjoyment of the membership in the Western Associated Press, represented by certificate No. 38, it applied to the association for the issue of a new certificate, and the association issued to the Dispatch Publishing Company a new certificate, and placed the name of that company upon its books as a member in virtue of the right acquired as successor to the St. Louis Dispatch Company, which membership was represented by certificate No. 64, but was the same membership as that represented by certificate No. 38; that the assessments on the membership had always been paid by the Dispatch Publishing Company; and that said company, by using the membership for one year, without applying for a new certificate or to have its name placed on the books of the Western Associated Press as the successor of the St. Louis Dispatch Company, acknowledged the title of the latter.

The prayer was that the Dispatch Publishing Company be decreed to pay the complainant $15,000, with interest at the rate of nine per cent per annum since October 1, 1879, and that, to make that sum, the good will of the Dispatch Publishing Company be sold; also the personal property used by it in connection with its business and certificate No. 64 in the Western Associated Press. To this amended bill a demurrer was filed and sustained, and a final decree of dismissal rendered. Among other exhibits the by-laws of the Western Associated Press were filed with the bill and made a part thereof, and these provided, among other things, as follows:

"I. — Membership. Any proprietor of a daily newspaper who has heretofore signed the articles of association and is now an active member of the same, and his lawful assigns,

and any such person or firm or corporation within the territory of the Western Associated Press who shall hereafter be admitted in accordance with these by-laws, shall be a member of the association, provided that no new member shall be elected except upon the terms prescribed by Article XV.

"II. — Stock.  The evidence of membership shall consist of a certificate of one share of the capital stock of the association, which certificate shall be transferable only on the books of the association as hereinafter provided."

"XII. — Transfers.  Any member selling or transferring his newspaper may transfer his certificate of stock to the purchaser or successor in the ownership of such newspaper, and it shall be the duty of the secretary, upon request, to transfer the same on the books of the association to such purchaser or successor, who shall then sign the articles of association and by-laws and become a member, with the same rights and privileges as the original member.  If any member shall discontinue the publication of a newspaper, or shall sell his newspaper to another member, his membership shall cease, and his certificate of stock shall be cancelled on the books of the association, and the treasurer shall refund to him the money paid to the association for the same."

"XIV. — Assessments.  The board of directors shall have power to make assessments upon the members to defray the expenses incurred in collecting and transmitting intelligence, and for other purposes not inconsistent with the charter and by-laws, and the board may discontinue the use of the news so collected to any member failing to pay promptly his assessment.  Any member to whom the use of the news has been so discontinued may be readmitted to the use of the same, within six months of the time of such discontinuance, upon his refunding to the other members of the association in the same city or town such increased assessment as they may have paid in consequence of said discontinuance.

"XV. — Admission of New Members.  Applications for membership in this association shall be made in writing to the board of directors, and if a majority of said board shall vote for the admission of the applicant, he shall sign the

articles of association and by-laws, and pay into the treasury the sum of ten dollars or an additional amount equal to what would be his *pro rata* share in the property of the association. It shall then be the duty of the secretary to issue to him a certificate of one share of stock, and to enroll his name in the list of membership: *Provided*, That no new members shall be admitted without the unanimous consent of the members in the city or town where his business is carried on."

The opinion of the court, by Judge Thayer, will be found reported in 36 Fed. Rep. 722.

From the decree dismissing the bill an appeal was taken to this court, and while pending here a stipulation was filed setting forth the dissolution by decree of court of the Dispatch Publishing Company and the successorship thereto of the Pulitzer Publishing Company, as the owner and publisher of the newspaper and of the membership in the Western Associated Press, which had issued to said company a certificate April 2, 1892, numbered 93. The appearance of the new corporation and of two directors of the dissolved company as parties defendant was entered.

*Mr. John M. Dickson* for appellant.

*Mr. C. E. Gibson* for appellee. *Mr. C. Gibson* was with him on the brief.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

In the language of counsel for appellant this bill "was filed for the foreclosure of a mortgage upon a certain newspaper, a newspaper plant, and a membership in the Western Associated Press." The contention is that the newspaper, plant, and membership were subject to the lien of the Sutton mortgage as one homogeneous property, and that any property of like kind substituted for any portion lost or destroyed became subject to this lien; that the identity of the newspaper, the membership, and the plant, remained up to July 1, 1887, when

the bill was filed, and that the defendant was estopped to deny such identity because of the similarity of the names; the wilful confusion of the good wills; the obtaining of the second certificate in lieu of the first; and because from the character of the plant all the changes made were in the nature of repairs, parts being replaced from time to time by reason of constant wear and tear, from which resulted a confusion of chattels, making the identification of the several parts of the plant impossible.

On December 1, 1879, when the note matured, and the defendant, the Dispatch Publishing Company, refused to pay it or to surrender the property on the demand of the trustee, the bill stated that none of the original presses, type, and paraphernalia for printing a newspaper, described in the mortgage, were in existence. The bill was not framed on the theory of holding the defendant for the value of the mortgaged chattels on the ground of wrongful conversion, nor was it charged that there was any wrongful intermingling of the original plant with that subsequently acquired, either by the St. Louis Dispatch Company, or the purchaser under the second mortgage, or his grantee, the Dispatch Publishing Company. The allegation was that the machinery, type, presses, and property of a perishable nature had been alienated or destroyed or gradually used up. This was done in the course of business, and as the plant on hand at the maturity of the note was an entirely new plant, not described in the mortgage, we think the mortgage could not be extended to it upon the theory of wilful intermingling. The clause in the Sutton mortgage in relation to after-acquired property was an executory agreement for the non-performance of which the mortgagee might recover compensation in damages as against the mortgagor, but as against the grantee of the purchaser at the sale, the lien of the mortgage could not embrace what had no existence when it was given, and was not acquired by the mortgagor, and if such grantee were liable at all it would be for the conversion of the existing property, and no foundation for such a charge is laid here, irrespective of the objection that the remedy would be at law.

Undoubtedly, good will is in many cases a valuable thing, although there is difficulty in deciding accurately what is included under the term. It is tangible only as an incident, as connected with a going concern or business having locality or name, and is not susceptible of being disposed of independently. Mr. Justice Story defined good will to be " the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessity, or even from ancient partialities or prejudices." Story Part. § 99.

As applied to a newspaper, the good will usually attaches to its name rather than to the place of publication. The probability of the title continuing to attract custom in the way of circulation and advertising patronage, gives a value which may be protected and disposed of, and constitutes property.

On the 9th of December, 1878, the St. Louis Dispatch Company ceased business as the publisher of a newspaper, and on that day another newspaper was published under the name of the Post-Dispatch. If the Dispatch Publishing Company acquired the good will of the St. Louis Dispatch Company, it also acquired the good will of the Post. The Sutton mortgage covered the good will of the St. Louis Dispatch, but it did not embrace the good will of the Dispatch Publishing Company or of the newspaper known as the Post-Dispatch, as existing July 1, 1887. Indeed, if there had been no consolidation with any other paper, and the good will that the St. Louis Dispatch had in 1878 had been conveyed to a separate concern, it could hardly be held that the good will of the latter eight years afterwards was the same good will which had been conveyed. Moreover, the good will of the Dispatch Publishing Company was from the first different from the good will named in the mortgage.

The paper was of a different name and issued by a different company and the good will was the joint good will, as we have said, of two papers. And if the Dispatch Publishing Company acquired on the 10th day of December, 1878, the good will belonging to the St. Louis Dispatch, for which it should have accounted, but refused to account, then it would be only liable as for a conversion, for the lien of the mortgage certainly could not extend to a good will which there was no pretence was ever embraced in it.

However, it is urged that the Dispatch Publishing Company did in fact acquire the place of business of the St. Louis Dispatch Company and the existing plant with the good will attached thereto, subject to the lien of the first mortgage; that when it consolidated the property and good will so acquired with the property and good will of the other newspaper, it retained the word "Dispatch" as part of the name; that it paid the interest up to October 1, 1879; and that its conduct was such as to amount to a direct representation to the mortgagee that it had agreed to put itself in the shoes of the mortgagor. Hence it is contended that the averment of the bill that the Dispatch Publishing Company agreed and assumed to pay the mortgage debt was justified as a legal conclusion upon the principle of estoppel. We do not concur in this view. It is admitted that there was no express or direct promise on the part of the defendant to pay the mortgage debt, and it cannot be held that the mere purchase of premises subject to a mortgage renders the purchaser personally liable to the mortgagee, as having assumed to pay it, or that the mere payment of interest in itself imposes that liability. *Elliott* v. *Sackett,* 108 U. S. 132; *Drury* v. *Hayden,* 111 U. S. 223; *Hall* v. *Morgan,* 79 Missouri, 47, 52.

There was no personal connection between the Dispatch Publishing Company and the complainant, and it is not charged that there was any representation that that company would be personally responsible for the debt, or that property acquired by it from other sources, and not embraced in the mortgage, should be subject to the mortgage lien. No fraud is alleged, but, in effect, only that the complainant was misled

by the payment of interest. What beneficial course the complainant was prevented from pursuing by reliance on the conduct of the Dispatch Publishing Company prior to the maturity of the note does not appear; but it does appear that on December 1, 1879, the Dispatch Publishing Company refused to pay the note and the last instalment of interest, and refused to surrender the property. Yet the complainant did not file this bill until nearly eight years afterwards. Clearly that delay is not attributable to the payment of interest nor to any conduct of the Dispatch Publishing Company prior to December 1, 1879. After that date the latter company confessedly held adversely to complainant, and it is difficult to see why any claim in respect of either the plant or the good will of the St. Louis Dispatch is not barred.

Courts of equity in cases of concurrent jurisdiction consider themselves bound by the statutes of limitation which govern actions at law. In many other cases they act upon the analogy of cases at law; but even when there is no such statute governing a case, a defence founded upon the lapse of time and the staleness of the claim is available in equity. *Godden* v. *Kimmel,* 99 U. S. 201; *Speidel* v. *Henrici,* 120 U. S. 377.

Under the statute of limitations of Missouri, actions upon any writing, whether sealed or unsealed, for the payment of money or property, must be commenced within ten years, and actions for taking, detaining, or injuring any goods or chattels, including actions for the recovery of specific personal property, or for any other injury to the person or rights of another, not arising on contract, must be brought within five years. Rev. Stats. Missouri, 1879, §§ 3229, 3230.

If the original plant were wrongfully used up, or by the consolidation the good will of the St. Louis Dispatch Company was wrongfully appropriated, the Dispatch Publishing Company became responsible as for a conversion. The rule in relation to wrongful admixture of property had no application; and it is not perceived how the act of appropriation in relation to either the plant or the good will could be made to operate, nearly eight years after adverse possession commenced, to extend the lien of the mortgage over property not

embraced in it.   If the use of the word "Dispatch" in the title of the new newspaper became wrongful after the Dispatch Publishing Company refused to pay the note or to surrender the property, then the complainant should have made its objections promptly known and sought the appropriate remedy; but this it did not do, and it would be inequitable to accord relief by injunction after the lapse of so many years and the inevitable changes in the condition of the property.   Such relief, however, is not invoked in this case, and the right to it, if it existed, would furnish no aid to the application to foreclose.   It is very clear that the Circuit Court was right in holding that there was no plant or good will, the sale of which could be decreed.

The case stands on no different ground in respect of the membership in the Western Associated Press.   As averred in the bill, and as shown by the articles and by-laws, such membership was always represented by a certificate of a share of stock, and could be held and sold only in connection with the publication of a newspaper or periodical, and in the manner prescribed.   The object of the association was "the procuring of intelligence for the newspaper press from all parts of the world by telegraph," and the holders of certificates of membership were entitled thereby to receive the news thus collected.   Applications for admission were obliged to be made in writing to the board of directors, and if a majority of the board voted for the admission of the applicant, he then signed the articles of association and by-laws and paid into the treasury the sum of ten dollars and an additional amount equal to what would be his *pro rata* share in the property of the association, but no new member could be admitted without the unanimous consent of all the members in the town or city where his business was carried on.   The 12th by-law provided, among other things, that "if any member shall discontinue the publication of a newspaper, or shall sell his newspaper to another member, his membership shall cease and his certificate of stock shall be cancelled on the books of the association, and the treasurer shall refund to him the money paid to the association for the same."

The St. Louis Dispatch Company ceased publication December 9, 1878, and it was averred that about one year thereafter the Dispatch Publishing Company, which during that year had been in the use and enjoyment of the membership without apparent change of ownership, procured the issue of a new certificate numbered 64. If, as alleged, the Dispatch Publishing Company acknowledged the title of the St. Louis Dispatch Company to the membership by continuing to use it, while standing in the name of the St. Louis Dispatch Company, it certainly disavowed it when it applied for a new certificate and to have its name placed upon the books of the association. The Associated Press in issuing that certificate admitted a new corporation to its membership, and that membership was not the same membership which was hypothecated to secure the Bowman note. It does not appear that the old certificate was cancelled, but as the publication of the St. Louis Dispatch had been discontinued and the membership in that sense had ceased by the terms of the by-laws, it is perhaps to be inferred that that had been done. Apparently the association had the right to accord or deny the privileges of membership as it saw fit, and whether its action in the admission of the new corporation to membership was wholly independent of certificate No. 38, or based upon the substitution of one share for the other, it would seem to follow, upon the assumption that a membership could be pledged or mortgaged without its consent, that the association was directly interested in the contention raised by the complainant in respect of that action, and that the Circuit Court was right in holding that the question ought not to be determined in the absence of the association as a party.

But in any view, the membership of the Dispatch Publishing Company was held adversely to the complainant. At the time the bill was filed, it had been so held for nearly eight years in the name of the Dispatch Publishing Company, which had paid all the assessments upon it and enjoyed all its privileges as the owner. If it obtained that membership under the by-laws without reference to certificate No. 38, then of course the bill as framed would fail, and if it had

been allowed to avail itself of the old membership, still its liability, if any, would be for a conversion, and the defences of laches and limitations would apply.

Viewed as an action for conversion, recovery was clearly barred as to the plant and the good will, and also as to this certificate, which was issued independently of the mortgage and not embraced within it. And so far as the bill proceeds upon the theory that the plant, the good will and the membership ought on equitable principles to be held subject to the lien of the mortgage, the court properly declined to assist a complainant that had slept upon its alleged rights for nearly eight years, and shown no excuse for its laches in asserting them. Cases sustaining the proposition that a mortgage may be foreclosed even after the debt has become barred by limitation have no application, nor does the fact that the Bowman note was still alive when the suit was instituted, since the question in this aspect is whether either or any of these alleged properties should on equitable grounds be brought within the operation of the mortgage, and upon that question we regard the delay of the complainant as an insuperable obstacle to a decree in its favor.

*Decree affirmed.*