[No. 3474.  Decided May 17, 1900.]

GEORGE G. LAWRENCE, *Appellant,* v. THE TIMES PRINT-
ING COMPANY *et al., Respondents.*

EXECUTION SALE OF FRANCHISES—TO WHAT APPLICABLE.

Laws 1897, p. 96, providing a method for the sale of fran-
chises, has reference to such as are comprehended within grants
from public or *quasi* public authority, and has no reference to
"news contracts," which pass under the name of "franchises" in
the newspaper trade, where the term is used, not in its legal
sense, but as having a particular trade meaning.

JUDICIAL SALE—FRANCHISES—INDEFINITENESS OF DESCRIPTION.

A sale of "franchises" under a foreclosure of a mortgage on a
newspaper, its plant, franchises, circulation and good will, de-
scribes no property with sufficient particularity to· be identified,
and hence passes no title to any rights which existed under a
contract between the mortgagor and the Associated Press for
news service.

NEWSPAPERS—USE OF ANOTHER'S NAME AND GOOD-WILL—REMEDY.

Injunction will not lie, at the instance of one who has pur-
chased a newspaper, its plant, good-will and franchises, at a
mortgage foreclosure sale, to restrain another newspaper com-
pany from usurping the good-will and employing a kindred name
for the paper published by it, since the remedy of the purchaser
at the foreclosure sale is confined to an action for damages for
conversion.

Appeal from Superior Court, King County. — Hon.
WILLIAM HICKMAN MOORE, Judge.  Affirmed.

*Ballinger, Ronald & Battle* and *Donworth & Howe,* for appellant:

It is the general rule of law that all new material added to an establishment under chattel mortgage to supply wear, decay, and destruction of old, and which has been so commingled with the old as not to be readily distinguished, would be included in the mortgage, and become part of the mortgaged property by accession. *Fowler v. Hoffman,* 31 Mich. 215. It is equally true that the enhancement in value or growth in the good-will and name of a newspaper in the ordinary course of business would pass to the mortgagee by accession. *Comins v. Newton,* 10 Allen, 518; *Crosby v. Baker,* 6 Allen, 295; *Bryant v. Pennell,* 61 Me. 108 (14 Am. Rep. 550). That the wrongful use of the name and good-will of a newspaper may be restrained is established by abundant authority. *Bell v. Locke,* 8 Paige Ch. 75 (34 Am. Dec. 371); High, Injunctions (2d ed.), §§ 1078, 1099, 1345, 1346; *Matsell v. Flanagan,* 2 Abb. Pr. (N. S.) 459. The good-will of a newspaper may be protected from deception and piracy. *Snowden v. Noah,* 1 Hopkins Ch. 347 (14 Am. Dec. 547); *American Grocer Pub. Ass'n v. Grocer Pub. Co.,* 51 How. Pr. 402; *Stephens v. De Conto,* 4 Abb. Pr. (N. S.) 47; *Bagby & Rivers Co. v. Rivers,* 67 Am. St. Rep. 357, and note (40 L. R. A. 632); *Duniway Pub. Co. v. Northwest P. & P. Co.,* 8 Pac. 283; *Dayton v. Wilkes,* 17 How. Pr. 510. The good-will of a business is property that may be sold or mortgaged, and the same is true of the business of publishing a newspaper. *Metropolitan National Bank v. St. Louis Dispatch Co.,* 36 Fed. 722; *Robertson v. Berry,* 33 Am. Rep. 335, and note; *Vonderbank v. Schmidt,* 32 Am. St. Rep. 336. For the definition of the term "good-will," see *Bell v. Ellis,* 33 Cal. 620.

*Bausman, Kelleher & Emory* and *Pratt & Riddle,* for respondents.

The opinion of the court was delivered by

REAVIS, J.—The complaint states substantially the following facts: That the defendant, The Times Printing Company, was incorporated in March, 1897; that the defendant, the Associated Press, was at all times mentioned a corporation created under the laws of Illinois and authorized to transact business in this state; that in May, 1886, in the city of Seattle, a daily and weekly newspaper was established, named "The Seattle Press," and at the same time there was published in said city another daily and weekly newspaper called "Seattle Times;" that the two papers were published and circulated in Seattle, under separate managements, from the time of their establishment until February, 1891, when the proprietors of The Seattle Press purchased the Seattle Times, and they were consolidated into one newspaper of daily and weekly circulation by the name of "Seattle Press-Times;" that in February, 1895, The Seattle Press-Times Company was incorporated under the laws of the state, and became the owner and publisher of the Seattle Press-Times, and such company also became the owner of the entire plant, machinery, and materials used in the publication of the Seattle Press-Times, including the good will, patronage, and circulation of the newspaper, and all the news franchises and privileges belonging to the same; that in June, 1895, the name of The Seattle Press-Times Company was amended in its articles of incorporation to "The Times Company;" that the publication of the Seattle Press-Times was continued in the same general style of type and appearance until May, 1895, when the name of the paper was altered by omitting the word "Press," and using therefor the name "The Seattle Times;" that the subscription list and circu-

lation remained the same, except so far as it had been increased or modified in the ordinary course of business, and that it was in fact the same paper; that The Seattle Press-Times Company was organized in pursuance of an agreement with Collins, owner of the Seattle Press-Times plant and newspaper, together with one Woolery and wife, and Collins agreed to sell to such corporation, when formed, the Press-Times plant and newspaper, the corporation to pay therefor $12,000, which was evidenced by three notes; that a chattel mortgage to secure the purchase price was duly executed on the 9th day of March, 1895, and the chattel mortgage is annexed to the complaint; that the mortgage describes that certain personal property situated at a particular place in Seattle, describing by schedule the press, type, and all the corporeal property used in the publication of the Press-Times plant, and adds, "together with said paper—Press-Times—plant, circulation, franchises, and good will thereof," for the sum of $12,000; that at the time the chattel mortgage was executed, the Seattle Press-Times had a valuable circulation and business; that it enjoyed a valuable news franchise with the defendant, the Associated Press, under a contract with said defendant; that the Associated Press is a news bureau or association which furnishes telegraphic news to certain newspapers located in various cities and towns in the United States, and is the only service for such news; that among the stipulations in its contract was that it might be transferred with the Seattle Press-Times newspaper, provided the new proprietor should enter into a new contract with the defendant Associated Press; that under such contract the newspaper was entitled to the exclusive use of the news reports; that it is indispensable to the life and successful operation of the newspaper to maintain and continue the privileges of the news franchise service with the

defendant, the Associated Press; that the right to receive such daily news reports of the news bureau or association is generally known and designated by the term "franchise;" that The Times Company on June 4, 1895, entered into a substituted franchise contract with the Associated Press, which was in all essential matters of the same tenor, substance, and effect as the former contract used by the company in the publication of the Seattle Press-Times, except that the substituted contract designated the name of the newspaper as "The Seattle Times," instead of the "Seattle Press-Times," the name of the paper having been changed in May, 1895; that the rights, privileges, and franchises of the Associated Press were included in the chattel mortgage to Collins; that the defendant, The Times Printing Company, incorporated in March, 1897, was organized for the purpose of diverting the news franchise with the defendant the Associated Press to itself, and of freeing the same from the lien of the chattel mortgage, and diverting to itself the patronage, name, circulation, and good will of the newspaper, the Seattle Press-Times or The Seattle Times, and freeing the same from the operation of the mortgage lien; that The Times Printing Company purchased all the property used in connection with and belonging to the newspaper plant from The Times Company; that thereafter the chattel mortgage was duly foreclosed, and, after sale upon due notice, the property of The Times Company was sold by the sheriff of King county. The decree in foreclosure is also annexed to the complaint, as well as the order of sale and the sheriff's return of the sale. The decree, order of sale, and writ of execution follow the description of the mortgaged property as contained in the mortgage. The sheriff's return of the writ exhibits what was sold, and how it was sold, and recites that it was offered for sale as follows: The

corporeal property scheduled, for the sum of $936; that the paper, Press-Times, plant, circulation, franchises, and good will thereof were sold for $80; that is to say, the sum of $15 was bid for the paper, the sum of $50 for the Press-Times plant, the sum of $5 for said circulation, the sum of $5 for said franchises, and the sum of $5 for said good will thereof. The bill of sale executed by the sheriff contains the same description of the personal property sold by him under the writ. That the plaintiff, through mesne conveyance, was the purchaser, and that he has demanded the franchise from the defendant, the Associated Press, and the circulation, name and good will of the newspaper, the Press-Times, and its continuous publication under altered names, from the defendant, The Times Printing Company; that at the time of the foreclosure of the chattel mortgage all the property was in the possession, control, and management of The Times Printing Company; that plaintiff has demanded from the Associated Press a new and substituted contract for the report of its news, and from The Times Printing Company a transfer of its contract with the Associated Press, so that a new or substituted contract can be issued to plaintiff; that The Times Printing Company is publishing a paper, the Seattle Daily Times. The value of the franchise from the Associated Press is stated at $10,000. The value of the newspaper, Seattle Press-Times and good will is stated at $5,000. Plaintiff asks for equitable relief; that the Times Printing Company be restrained from further using the name of the Seattle Press-Times, Seattle Times, or any kindred name which may infringe plaintiff's rights, and that the defendant, the Associated Press, enter into its usual contract with plaintiff to furnish its news reports. The usual contract between the defendant, the Associated Press, and a newspaper, for its news reports, is set out, in

which it is stated that the rights of the parties thereto are controlled and governed by the by-laws of the Associated Press in force during the life of the contract, one of which is:

"No membership contract shall be finally executed or binding upon the association until it shall have been approved or ratified by the executive committee or a majority of the members of the board of directors."

It is agreed that the Associated Press will not furnish any news report to any other paper in the territory described in the contract without the consent of the contracting newspaper, and the contracting newspaper agrees to furnish the Associated Press the news in the territory described in the contract in accordance with the provisions of the by-laws of the Associated Press. It is also agreed between the parties that the franchise or privilege granted by the contract to the newspaper may be transferred with the newspaper, provided the new proprietor enters into a new contract with the Associated Press, similar to the existing contract. The defendants each appeared separately, and filed a general demurrer to the complaint, which was sustained.

1. The principal object sought is to compel the defendant, the Associated Press, to furnish its news reports to the plaintiff. It does not appear that plaintiff assumes that he is now, or has been, the publisher of a newspaper in Seattle. Indeed, he complains that he cannot publish a newspaper without the news reports. The observations of the court in *Metropolitan National Bank v. St. Louis Dispatch Co.*, 36 Fed. 722, would seem to be pertinent here:

"It is evident that the stock in question [the Western Associated Press membership] is not property of an ordinary character, such as may be transferred at will by the owner. The bill shows that it is only vendible to persons or corporations who are engaged in publishing a news-

paper or other periodical, and that. no other persons or
corporations· are eligible to membership in the association.
.   .   .   From the statements contained in the bill with,
respect to the character and functions of the organization
known as the 'Western Associated Press,' it appears to
me clear that a purchaser at a foreclosure sale of the share
or stock or membership now in question, even if the court
should order such a sale, would not acquire the privileges
of membership in the association, unless it should see fit
to accord him such privileges.   Consent on the part of the
corporation to the admission of a member appears to be
essential to constitute a person a member."

It is maintained by counsel for the defendants that the
contract with the Associated Press is such a peculiar per-
sonal right that it is not subject to sale under mortgage
foreclosure; that it is in the nature of a personal contract
for services, and not transferable without the mutual con-
sent of the parties.   Apparently, it seems, there are ele-
ments of personal service entering into the contract.   The
Associated Press furnishes its news reports.   The pro-
prietor of the newspaper so furnished, under the contract,
must furnish to the Associated Press the news in the terri-
tory described.   It appears here clearly, however, that the
peculiar value of the contract in controversy between the
plaintiff and The Times Printing Company is based upon
the allegation that the right to receive the news reports is
exclusively given or conveyed to one newspaper proprietor.
If the contract be in the nature of one for personal services,
as suggested, but not here determined, it could not reason-
ably be said to be the subject of a mortgage or sale; and
the court does not look favorably upon the contention that
it is an exclusive contract.   Contracts in restraint of com-
merce and trade have always been obnoxious to the law,
and fair reasoning and correct legal analogies would seem
to imply that in so important a field as news and intelli-

gence to the general public an agreement to restrict or monopolize the agencies of dissemination of such news and intelligence should not be upheld.

2.    Plaintiff shows as his right to maintain this action the sheriff's certificate of sale of certain scheduled corporeal property, together with a newspaper, good will, and franchises thereof.   The contract with the Associated Press is assumed by plaintiff to be included within the word "franchises" named in the certificate of sale.   It is apparent that the term "franchises" is not used in the mortgage or certificate of sale in the legal sense, or in its ordinary popular sense.   The term, in a legal sense, contains the element of a grant or immunity, privilege, or exemption by public or quasi-public authority.   It may sometimes be used in a popular sense as a privilege.    Our statutes (Laws 1897, p. 96) provide a method for the sale of franchises, but we cannot agree with counsel for defendants that the franchise mentioned in the chattel mortgage comes within the terms of the statute.   It is stated, however, in the complaint, that within the term "franchises" is included the contract that existed between The Times Company and Associated Press for the report of the news.   The term, then, as used, must be assumed to have a particular trade meaning, and not be taken in its ordinary and accepted signification.   It seems at the sale made by the sheriff there was offered to bidders the "franchise" of the Press-Times paper, and it was offered separately, the amount bid therefor being $5.   There was no specification of what this term meant.   We do not suppose the general public knew what it meant.   It was not even specified how many franchises were offered, or what they were as belonging to the paper.

In *General Electric Co. v. Wightman*, 39 N. Y. Supp. 420, it was adjudged that a sale of "choses in action"

under foreclosure of a mortgage passes no title unless they are described in the judgment, notice of sale, and conveyance, with sufficient particularity to be identified. In that case it was said:

"To hold that choses in action pass under general words, in judgments and conveyances, would cause confusion and uncertainty in respect to the property which the purchasers under foreclosure sales acquire. Judicial sales must describe with reasonable certainty the property sold."

In *Dean v. Biggs,* 25 Hun, 122, it was adjudged that a balance unpaid on a subscription to the stock of a corporation was not covered by a mortgage purporting to convey the right of way of the railroad and its other property, chattels, and things pertaining thereto, its chartered rights, privileges, and franchises, and all the estate, right, title, interest, property and possession, claims, and awards whatsoever of the railroad, of, in, and to the same; and the decision was affirmed in 93 N. Y. 662.

In *Milwaukee & Minnesota Ry. Co. v. Milwaukee & West R. R. Co.,* 20 Wis. 174 (88 Am. Dec. 740), it was held that a right to enforce a contract for the payment of an obligation due would not pass by a mortgage sale unless a more definite description of the same were given in the notice of sale than in the mortgage, which was "all and singular the stock, railroad or other bonds, bills of exchange, promissory notes, accounts, causes of actions, demands and choses in action of whatsoever nature." The court observed:

"It is averred, to be sure, that the trustee sold at public auction all the property, rights, privileges, franchises, things in action and other things described in the mortgage. Is it permissible that choses in action, instruments in writing, should thus be exposed for sale and swept away in this loose and uncertain manner? What purchaser

could bid understandingly when property is thus offered for sale, without any designation or description? Obviously a bidder would not know, and would have no means of ascertaining, whether the choses in action were worth a thousand, a hundred thousand, or a million of dollars. . . No person, therefore, attending the sale could know what price to bid, or how to regulate his judgment, if there was no specific and certain designation of the property offered for sale."

The observations of the supreme court of Wisconsin would seem to be pertinent here, as it seems the purchaser of the franchises as returned by the sheriff paid $5 at the sale for a contract which is now asserted to be worth $10,000. See, also, *Smith v. McCullough,* 104 U. S. 25.

It is frequently true that general descriptions of property in a mortgage may be aided by external facts and evidence, and it is not necessary to determine that, with the meaning attached to the term "franchises" in the chattel mortgage under consideration, the particular privileges or contracts included in the word might not be identified and defined as between the parties. But there must be something more specific at a judicial sale. It is concluded, therefore, that plaintiff, under his certificate of sale and the sheriff's return, does not show that he holds any rights under the contract, if such existed, between The Times Printing Company and the Associated Press.

3. In the case of *Metropolitan National Bank v. St. Louis Dispatch Co.,* 149 U. S. 436 (13 Sup. Ct. 944), there are presented many features similar to those in the case at bar. There it was observed, in reference to the good will of a newspaper:

"Undoubtedly, good will is in many cases a valuable thing, although there is difficulty in deciding accurately what is included under the term. It is tangible only as an incident, as connected with a going concern or business having locality or name, and is not susceptible of being

disposed of independently. . . . As applied to a newspaper, the good will usually attaches to its name rather than to the place of publication. The probability of the title continuing to attract custom in the way of circulation and advertising patronage, gives a value which may be protected and disposed of, and constitutes property."

In that case the St. Louis Dispatch Company ceased business as the publisher of a newspaper, and on the same day another newspaper was published under the name of the "Post-Dispatch," and it was observed by the court:

"Moreover, the good will of the Dispatch Publishing Company was from the first different from the good will named in the mortgage. . . . And if the Dispatch Publishing Company acquired on the 10th day of December, 1878, the good will belonging to the St. Louis Dispatch, for which it should have accounted, but refused to account, then it would be only liable as for a conversion. . . ."

At the time of the sheriff's sale, and for some two years theretofore, The Times Company, the mortgagor, was not publishing the Press-Times, or any other newspaper, in its place, but The Times Printing Company, the defendant, was publishing a paper of a somewhat variant name. There were modifying and changing conditions occurring in the good will and circulation of the continuing publication. Without particularly noticing the separate sale of the good will by the sheriff, it is quite plain that the good will of the going concern, the Press-Times newspaper, as such, distinctively, was only an incident after the newspaper plant passed from The Times Company to The Times Printing Company, and, whatever the injury that occurred to the mortgagee, it must be compensated in damages for conversion of the good will of the Press-Times. It does not appear that a case is presented requiring in-

junctive relief against the use of the name "Press-Times," or a kindred name.

The judgment is affirmed.

FULLERTON, J., concurs in the result.

GORDON, C. J.—I concur in the judgment of affirmance, but not in what is said concerning the effect to be given the contract referred to in the opinion as the Associated Press contract. If, as is suggested in the opinion, its character is one "in the nature of a personal contract for services," then it does not fall within that class of contracts which are obnoxious to the law because made in restraint of trade and commerce.

DUNBAR, J.—I concur in the affirmance of the judgment for the reason that the description of the franchise sold is not sufficiently definite.