GEORGE W. YOST, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JUANITA YOST, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 4969, 4970. Promulgated May 28, 1945.

*Alfred J. Schweppe, Esq.*, and *Maurice R. McMicken, Esq.*, for the petitioners.

*W. H. Payne, Esq.*, for the respondent.

### OPINION.

MELLOTT, *Judge*: Each of these consolidated cases involves deficiencies in income tax for the calendar years 1940 and 1941 in the amounts of $75.44 and $1,071.70. The basic facts have been stipulated and are hereby found. They will be summarized. Additional findings based upon testimony adduced at the trial will be made; but they will be specifically so designated. Inasmuch as the petitioner in Docket No. 4970 is the wife of George W. Yost and filed a separate return of income, identical to that filed by him, and since the questions involved in the two cases are the same, George W. Yost will hereinafter be referred to as the petitioner.

The issue in each case is whether amounts received during the taxable years under agreements theretofore entered into between petitioner and Richard B. and Robert L. Newell were capital gains or ordinary income.

For some time prior to the taxable years petitioner had been engaged in the bus passenger transportation business in suburban Seattle as part owner and general manager of Suburban Transportation System. Richard B. Newell and Robert L. Newell (sometimes herein referred to by first name and sometimes as the Newells) had, for some time prior to January 28, 1935, discussed with petitioner the formation of a new corporation to manufacture bus and truck bodies. Richard had been employed for a number of years as draftsman and chief engineer for Heiser's, Inc., a manufacturer of bus and truck bodies at Seattle, and Robert had been engaged in the sale throughout the Pacific Northwest of bus and truck bodies manufactured by Wentworth & Irwin of Portland, Oregon.

As a result of the discussion petitioner and the two Newells, on January 28, 1935, organized the Tricoach Corporation (hereinafter called Tricoach), a Washington corporation with its principal office at Seattle. Thereafter and at all times herein mentioned the three owned all of the outstanding stock of the corporation and were its only officers and directors.

Tricoach had an authorized capital of $50,000, composed of 1,000 shares of common stock of the par value of $50 each. Yost subscribed for 150 shares and each of the Newells subscribed for five shares, Yost paying $7,500 and each of the Newells $250. Robert was elected pres-

ident and sales manager, Richard vice president and chief engineer, and petitioner secretary, which offices they continued to hold during the entire operation of the company.

The salary of the two Newells was originally fixed at $250 per month; but in addition thereto they and petitioner were each to receive adjusted compensation, at the end of each calendar [1] year, equivalent to one-third of the amount of the net profits for the year which should be in excess of an amount necessary to pay 8 percent dividends on the outstanding stock.

The result of the operation of Tricoach for 1935, after the payment of the salaries to the Newells and other expenses, was a deficit of $1,068.18. The deficit was wiped out by the 1936 operations and in December of that year a dividend of $80 per share, "but not to exceed the net profits for the year," was declared. Petitioner received a dividend of $11,649.64 and each of the Newells received $388.32.

On December 16, 1936, 764 additional shares of stock were issued at par, 348 shares to petitioner and 208 shares to each of the Newells. On December 31, 1936, 924 shares were outstanding, the total paid-in capital being $46,200.

The monthly compensation of the Newells was increased to $300 per month during 1936 and they were paid on such basis for six months of that year. Each therefore received during 1936 $3,300 as salary. The net income of the corporation for that year was substantial and petitioner and each of the Newells received, during the year, "adjusted compensation" of $10,140.95, or a total of $30,422.95.

On December 2, 1937, the remaining 76 shares of the 1,000 authorized by the charter of Tricoach were issued at par, 12 to petitioner and 32 to each of the Newells. The profit of Tricoach was substantial for the year 1937. On December 27, 1937, a dividend of $20 per share, "but not to exceed the net profits for the year 1937," was declared, as a result of which petitioner received $7,968.08 on his 510 shares and each of the Newells received $3,827.81 on his 245 shares. Petitioner and each of the Newells also received, as "adjusted compensation" for that year, $11,927.71, an aggregate of $35,783.13.

The "adjusted compensation" referred to in the preceding paragraphs was in addition to the cash dividends received during 1936 and 1937. Petitioner, on his original investment of $7,500 in Tricoach, therefore, received during the two years the aggregate amount of $41,686.38, $19,001.42 of which was invested by him subsequently in its stock and in making up his portion of the 1935 deficit. At that time he owned 510 of its fully paid-up shares, or 51 percent of its stock.

As of November 1, 1937, petitioner and the Newells formed a partnership under the name of Tricoach Sales Co. (hereinafter re-

---

[1] The stipulation states at the end of each calendar year. The resolution states at the end of each fiscal year. The disparity appears to be immaterial.

ferred to as Sales Co.) to carry on the general business activities appertaining to the wholesale and retail distribution of motor vehicles and trading in commercial paper relating to such transactions. Petitioner contributed $20,000 and each of the Newells $10,000, petitioner having a 50 percent interest and Richard and Robert each a 25 percent interest. Robert was to devote most of his time to the partnership as general manager in charge of sales promotion, for which he was to receive a salary of $200 per month. Richard was to have charge of all matters relating to engineering services and construction, specifications, and purchase contracts and petitioner was to have charge of transactions relating to purchase and sale of commercial paper, borrowing of funds, and similar financial matters. For the two months in 1937 the firm's net profits were $526, petitioner's share being $263.

In March 1936 Heiser's, Inc. (the former employer of Richard) made an assignment for the benefit of creditors and during 1936 all of its machinery and equipment was sold to Pacific Car & Foundry Co. (hereinafter called Pacific). The machinery and equipment was installed in Pacific's Renton plant and a bus body manufacturing plant was started in competition with Tricoach. The venture resulted in considerable loss to Pacific in each of the years 1936 and 1937.

For several months throughout 1938 Pacific negotiated with the Newells and petitioner for the purpose of accomplishing a merger or consolidation or working out some method to eliminate the competition of Tricoach and to secure the services of the two Newells to manage the production and sales of the motor coach division of Pacific. The arrangement finally worked out contemplated leasing by Tricoach of its machinery and equipment to the Newells for 10 years, together with an option to them to purchase it by December 31, 1938, at its depreciated book value. The Newells were to sublease to Pacific all of the Tricoach machinery and equipment for 7½ years from October 1, 1938, and it was to be moved, at Pacific's expense, to its Renton plant. Pacific was to operate its motor coach division for 7½ years from October 1, 1938, to employ the Newells for said period at a minimum salary of $250 per month each, and, in addition thereto, to pay each of the Newells one-sixth of the profits of the business of the motor coach division earned during said term. Richard was to have charge of the production end and Robert was to manage the balance of the business. Pacific was to purchase, as needed, for cash at then market prices, all of Tricoach's materials inventory and to furnish free storage space if the inventory should be moved to its plant. A copy of the agreement is attached to the stipulation as Exhibit 7. Further reference to this document will be made and it will sometimes be referred to as the four-party agreement.

At the same time that the four-party agreement was executed petitioner and the Newells entered into further agreements, which contemplated an arrangement whereby petitioner would lend to each of the Newells, without interest, $4,187.83, to be used to purchase the machinery and equipment of Tricoach, which the Newells were to sublease to Pacific.

Separate agreements were executed by each of the Newells and petitioner, petitioner being designated in each as the second party. Each agreement recited, *inter alia:*

IN CONSIDERATION that the second party shall consent to and enter into a certain contract between [Pacific, Tricoach et al., Exhibit 7 referred to above] * * * and shall, on or before December 31, 1938, advance to first party the sum of Forty-one Hundred Eighty-seven 83/100 ($4,187.83) Dollars, without interest, to be used by first party for the purpose of acquiring joint ownership of the machinery and equipment to be sub-leased * * * [to Pacific], the first party hereby agrees to pay unto second party an amount equivalent to: one-third (⅓) of all compensation, or damages in lieu thereof, not in excess of Thirty-seven Thousand Five Hundred Dollars ($37,500.00), said first party shall receive or be entitled to receive from [Pacific] by reason of said contract as set forth in Exhibit "A" attached, [Exhibit 7] exclusive of the minimum salary of $250.00 per month and rental income separately set forth in said contract. Payments to be made within three (3) days after first party shall receive an accounting and settlement of his adjusted bonus compensation from the Pacific Car and Foundry Co. for each respective calendar year or fractional period.

Each agreement further provided that, in the event any part or all of the machinery and equipment should be sold by the Newells, one-fourth of the net proceeds derived from the sale should be paid to petitioner and applied in liquidation of the $4,187.83 loan and that one-half of all other payments made pursuant to the agreement would be applied in liquidation of the loan until it should be paid in full. In the event that the first party (Richard in one contract and Robert in the other) should terminate his employment with Pacific either voluntarily or by reason of death, the unpaid balance of the loan was to become immediately due and payable; however, first party, his heirs, assigns, or legal representatives was given the option of assigning to petitioner an undivided one-fourth interest in the machinery and equipment, together with the proportionate share of rental income to be subsequently earned, in full satisfaction of the unpaid balance, if any, then due on the loan. In the event that the named Newell should continue in the employ of Pacific for the full 7½ years, then petitioner agreed "to waive, cancel, and forgive any unpaid balance of the aforesaid loan in the amount of $4,187.83." All of the contracts referred to above were dated August 3, 1938.

At a joint meeting of the stockholders and directors of Tricoach held on August 2, 1938, a resolution was adopted to suspend the manufacturing operations of the corporation on or about October 1, 1938;

to gradually liquidate its affairs; to enter into the proposed agreement with Pacific (Exhibit 7) ; and to enter into a lease agreement with the Newells for lease of the corporation's manufacturing machinery and equipment, with an option whereby they might purchase such machinery and equipment on or before December 31, 1938, for cash at its depreciated book value. (The option was exercised.)

The minutes of the meeting referred to above recite:

After lengthy discussion the following resolution was introduced and unanimously adopted:

WHEREAS: the headquarters building of the Tricoach corporation, at 705 Sixth Avenue North, Seattle, Washington, has been inadequate to properly house the corporation's manufacturing activities, it being necessary to rent additional space in other buildings in order to relieve the overcrowded conditions; insufficient space in which to place tools and equipment, work under construction, and for employees to perform their respective duties, has caused general inefficiency in direct labor production and an unwarranted increase in overhead expenses in ratio to productive man hours; making continued occupancy of the present quarters unprofitable; and

WHEREAS; the present general business conditions, labor unrest, excessive taxation, governmental regulation and interference with manufacturing operations, etc., discourage the reestablishment of operations in another location; and

WHEREAS; Robert L. Newell and Richard B. Newell, who have heretofore been in active management of the corporation's affairs, have an opportunity to enter the employ of the Pacific Car and Foundry Co., Motor Coach Division, and receive greater compensation than can be expected from continued operation of the Tricoach Corporation; and have arranged with their prospective employer to use all manufacturing machinery and equipment on a rental basis and to bear all cost of removing same from its present location, and to purchase whatever materials and supplies as may be on hand October 1, 1938, at current market prices when required, so that no unusual expenses or losses may be incurred by Tricoach Corporation by reason of suspending operations;

NOW THEREFORE BE IT RESOLVED [substance shown above].

The concluding paragraph of the minutes is as follows:

Upon motion duly made and seconded, an agreement dated August 2, 1938, signed by all the stockholders of Tricoach Corporation, restricting the sale and transfer of shares of capital stock to persons other than the present stockholders and members of their respective families, was received and ordered filed as an appendix to these minutes.

In 1940 there were paid to petitioner by the Newells, under their respective agreements, the following amounts, which were applied by petitioner as follows:

| | From Robert L. Newell | From Richard B. Newell | Total |
|---|---|---|---|
| Payments received | $2, 603. 65 | $2, 603. 65 | $5, 207. 30 |
| Applied toward payment of their loans | 1, 301. 83 | 1, 301. 82 | 2, 603. 65 |
| Treated as a community capital gain | 1, 301. 82 | 1, 301. 83 | 2, 603. 65 |

On June 26, 1940, petitioner received $25,500 and the two Newells each received $12,250 from Tricoach as liquidating dividends. Each of the parties duly acknowledged receipt of the foregoing sums and directed that they be paid over to the Sales Co. and be charged to their respective accounts. That was done. Receipt was signed by petitioner reading as follows:

RECEIVED OF TRICOACH CORPORATION, the sum of_____ $25,500.00 Twenty-five thousand five hundred dollars; same being an amount equivalent to the par value of all the capital stock in said corporation owned by the undersigned. In event the Tricoach Corporation shall resume its business activities the undersigned hereby agrees to return the funds thus advanced; but, if business activities are not resumed, the funds thus advanced shall, upon dissolution, be applied in settlement of any liquidating dividends that may be declared.

The stock had cost petitioner $25,500 plus $1,001.42, his pro rata share of the 1935 deficit, and it therefore had a basis in his hands of $26,501.42. Respondent, in determining the deficiencies, has allowed as a community deduction 50 percent of the long term capital loss of $1,001.42 and this item is not in controversy.

In 1941 there was paid to petitioner by the Newells, under their respective agreements, the following amounts, which were applied by petitioner as shown:

| | Robert L. Newell | Richard B. Newell | Total |
|---|---|---|---|
| Payment received | $9,286.00 | $9,286.00 | $18,572.00 |
| Applied toward payment of balance of loans | 2,886.00 | 2,886.01 | 5,772.01 |
| Treated as community capital gain | 6,400.00 | 6,399.99 | 12,799.99 |

In 1942 petitioner received final payments of $610.34 from each of the Newells, the total received from both of them being, as shown by the schedules above, $24,999.98.

In each petitioner's 1940 income tax return there was reported as a long term capital gain $1,301.82, being his community one-half of the $2,601.65 received from the two Newells in 1940 after the above mentioned application on their indebtedness, and as such long term capital gain there was taken into account, for tax purposes, only 50 percent thereof, or $650.91.

Respondent, in each of his deficiency letters, held that said amount of $1,301.83, received by each petitioner in 1940 was not a capital gain, but was ordinary income, taxable in full, thereby increasing each petitioner's taxable income for 1940 by $650.91. If the amount was correctly reported by the petitioners, then (because of uncontested adjustments made by respondent) the correct deficiency of each petitioner for 1940 would be $2.57.

In each petitioner's 1941 income tax return there was reported as a

long term capital gain $6,400, being his community one-half of the $12,800 received from the two Newells in 1941 after the above mentioned application on the balance of their indebtedness, and as such long term capital gain there was taken into account, for tax purposes, only 50 percent thereof, or $3,200. Respondent held that said amount of $6,400 was not a capital gain, but was ordinary income, taxable in full, thereby increasing each petitioner's taxable income for 1941 by $3,200. If said amount was correctly reported as a long term capital gain and only 50 percent thereof, or $3,200, is to be taken into account for income tax purposes, then there would be no deficiency for 1941.

Based upon oral evidence adduced at the trial and admissions of the parties, it is also found that Tricoach has never been dissolved; that petitioner received $25,500 and nothing more from it upon its liquidation; that, although it had no assets subsequent to the liquidation, it was kept alive so that it could be availed of in the event the stockholders should desire to use it; that the stockholders had in mind they might get back into the same business and conduct the corporation as they had formerly done, although the possibility they might do so was considered remote; that in order to get the agreements with the Newells under which the payments in issue were received it was necessary for petitioner to enter into the four-party agreement (Exhibit 7) and to advance to Robert and Richard each the sum of $4,187.83, without interest; that the amounts were to be returned, if at all, out of compensation or damages in lieu thereof received by the Newells from Pacific; and that petitioner would not have entered the four-party agreement unless arrangements had been made under which he was to receive additional payments from the Newells.

Petitioner contends that the amounts received from the Newells over and above the repayment of their loans ($2,603.65 in 1940 and $12,800 in 1941) constituted long term capital gains to the community. His argument proceeds substantially as follows: The shares of Tricoach stock were capital assets. Tricoach was a successful corporation, as is indicated by its earnings. All that was distributed to the stockholders upon its liquidation was the par value of the stock, its earnings having previously been distributed as dividends and adjusted compensation. The dividends in complete liquidation are to be treated as a payment in exchange for the stock under section 115 (c) of the Internal Revenue Code. But the stock had a value in excess of par. Petitioner would not have consented to the corporation going out of business except for the consideration to be paid to him by the Newells. The payments by the Newells were therefore additional consideration to him for his consent to the liquidation and are to be added to the amounts received from the corporation as a liquidating dividend.

The argument is ingenious but unsound. The statute relied upon states that amounts distributed in complete liquidation of a corporation "shall be treated as in *full* payment in exchange for the stock." It is doubtful if we are at liberty to construe it, as petitioner obviously wishes it to be construed, as meaning in *part* payment for the stock. But, passing this question, we examine in more detail the arguments of the respective parties upon brief.

Petitioner cites but two cases, *David A. DeLong*, 43 B. T. A. 1185, and *Margery K. Megargel*, 3 T. C. 238. In the *DeLong* case a majority stockholder in a corporation, being desirous of effectuating a reorganization, paid cash to a minority stockholder to induce him to part with his stock and participate in the reorganization. He did so. It was held that the "crux of the business" was that the minority stockholder had disposed of his stock in the old company and received in exchange shares of stock in the new and $14,000 in cash; that the total consideration should be treated as the salesprice of the stock and the excess over cost as capital gain; that the portion of the gain attributable to the stock received was subject to the nonrecognition provisions of the statute and not subject to tax; and that only the portion attributable to the cash was then taxable. In the *Megargel* case the taxpayer had transferred stock, in 1933, upon representations which she later considered had been made fraudulently. In 1939 she instituted an action to annul the transaction and to recover the stock. The action was compromised, the taxpayer receiving cash, dismissing her action, and executing a general release. It was held that, inasmuch as the action had been primarily for the recovery of capital assets, the cash received in settlement partook of the nature of a capital recovery and the gain was taxable as a capital gain.

The cited cases, in our judgment, furnish but slight aid to petitioner. He did not sell or dispose of his stock, but still has it. The amount received in the liquidation has been treated as the statute contemplates. Passing the seeming inconsistency implicit in his failure to contest the allowance of a capital loss in connection with the liquidation of the corporation and thereby being in the position of claiming both a gain and a loss upon what he insists was an "exchange" of his stock, we examine in more detail his contention that the two types of payments—the liquidating distributions and the amounts received from the Newells—are to be added together for the purpose of computing his capital gain.

In his returns for the taxable years petitioner treated the amounts received from the Newells as "Tricoach Goodwill." We do not understand that he is now contending that the characterization is proper. It is therefore probably unnecessary to point out that good will "cannot be carved out of a business and sold independently of the going con-

cern * * *" *Dodge Bros.* v. *United States*, 118 Fed. (2d) 95. Cf. *Metropolitan Bank* v. *St. Louis Dispatch Co.*, 149 U. S. 436. It is also difficult to see how a corporation, stripped of all of its assets and obligated by a valid contract to refrain for a period of 7½ years from engaging in the business for which it had been organized and equipped, had any good will of value, especially since its stockholders were bound by the same agreement and could not dispose of their stock in the corporation except to the other stockholders or members of their respective families. Assuming that any good will existed, it was never transferred to, or disposed of by, petitioner.

Returning to petitioner's argument upon brief, he insists that he would not have consented to the corporation going out of business and liquidating unless he had been paid a substantial sum over and above the par value of his stock. He so testified at the hearing, and we have no reason to believe he was not telling the truth. But that does not prove that the amounts received from the Newells in the later years were received from the sale or exchange of his stock, even if it be assumed, contrary to the fact, that his stock had been disposed of. The form in which the parties chose to mold the transaction is clearly indicated by the documents which they signed. They are the best evidence of what they intended to do and of what they did. In consideration of petitioner consenting to the four-party contract, thereby effectively binding the corporation in which he owned the controlling interest and himself not to "own, operate, lease, conduct or have any interest in any automobile, bus or coach manufacturing or selling business in the States of Washington, Oregon, Idaho or Montana during the life of [the] agreement [7½ years] · * * * [and not to] work for, aid or assist any person, firm, corporation or organization engaging in any such business * * * in competition * * *," and in consideration of petitioner advancing to each of the Newells $4,187.83, they agreed to share the profits which should be received from the Motor Coach Division of Pacific. The amounts in issue represented his share in the profits.

In our opinion respondent is correct in designating the payments made by the Newells to petitioner as the fruits of a joint venture. His suggestion that a portion may have been received from an agreement not to compete in business may be passed. In any event we think it is clear that they were not received "from the sale or exchange of a capital asset." The Commissioner therefore committed no error in including the amounts in the community income.

*Decision will be entered in each case for the respondent.*