Appeal of THE POMPEIAN MANU-        Docket No. 573.
        FACTURING CO.

Under the evidence in this case, certain payments made from the profits of the taxpayer corporation purporting to be for good will, were, in fact, a distribution of profits and as such are neither deductible as expenses nor addition to invested capital.

Submitted February 4, 1925; decided March 18, 1925.

*H. A. Mihills, C. P. A., J. J. Miller, C. P. A.,* and *H. L. Smith, Esq.,* for the taxpayer.

*Laurence Graves, Esq.,* for the Commissioner.

Before GRAUPNER, LITTLETON, and SMITH.

This appeal is from a determination of deficiencies in income and profits taxes as follows:

| | |
|---|---|
| 1917 | $19,591.97 |
| 1918 | 22,088.11 |
| 1919 | 21,616.77 |
| Total | 63,296.85 |

The appeal was heard on its merits and from the evidence submitted the Board makes the following

FINDINGS OF FACT.

1. The taxpayer is a corporation organized under the laws of the State of Ohio, with its principal place of business at Cleveland. It was incorporated in the year 1905 with capital stock of $100,000, for the purpose of acquiring and continuing the business established by one F. W. Stecher and operated as the Pompeian Manufacturing Co., a sole proprietorship. Stecher was engaged in the drug and barber supply business, and operated under the proprietorship name of Pompeian Manufacturing Co., solely for the purpose of manufacturing and selling Pompeian Massage Cream.

2. On December 30, 1905, Stecher made an offer to the taxpayer, which was incorporated at his instigation, to sell the business of the

Pompeian Manufacturing Co., a proprietorship, which offer is in words and figures as follows:

CLEVELAND, OHIO, *December 30, 1905.*

To THE POMPEIAN MANUFACTURING CO.,
*Cleveland, Ohio.*

GENTLEMEN: I hereby offer to sell to your company for the sum of ninety-nine thousand, six hundred dollars ($99,600.00), the business heretofore now and now conducted [*sic*] in the name of Pompeian Manufacturing Co. at 92 Prospect Street, City, including all its assets, stock manufactured, fixtures, trade-marks, copyrights and leasehold of said business free of incumbrance. Said company to assume and pay all indebtedness and liability heretofore contracted by Pompeian Manufacturing Co. and remaining unpaid. Said sale to be on the express condition that your company shall elect me as president thereof for the term of ten years beginning January 1, 1906, and my wife as vice president for a like period of time, and that in case of decease before the expiration of said period of ten years, that my wife or such other person as she may designate, be elected as president as my successor, for said remaining period of ten years; and provided further that your company, by proper resolution and contract agree to pay to me, or in case of my decease, to my wife or her representative, for the period of ten years from January 1, 1906, the sum of $20,000 each and every year during said period of ten years, as a royalty and compensation for the good will of my said business above mentioned, provided the net earnings of the business for each year equal $20,000. If, however, said net earnings do not equal $20,000 the amount so to be paid me shall not in any year exceed the amount of the net earnings for that year, which said sum is to be payable by said company before any dividends shall be declared as payable on the stock of the corporation. Said consideration of $99,600 shall be payable to me by 996 shares of the capital stock of the company of the par value of $100 each and to be issued as fully paid up; and' being the same stock heretofore subscribed for by me; said property and assets so sold to be received by you in full payment of said subscription.

Very truly yours,

(Signed)     F. W. STECHER.

3. The taxpayer accepted the offer and on December 31, 1905, entered into an agreement with Stecher as follows:

*This memorandum of agreement* made and entered into at Cleveland, Ohio, this 30th day of December, 1905, by and between the Pompeian Manufacturing Co., first party, and F. W. Stecher, second party, is to evidence:

*That whereas* first party has by resolution of its stockholders and board of directors, duly accepted second party's proposition of sale of his business heretofore carried on by him in said city, to which proposition reference is hereby made;

*And whereas* said first party has issued to second party by way of payment of the purchase price the capital stock of second party proposed to be accepted by second party as such payment;

*And whereas* said sale and purchase requires the election of second party as president of first party, for the period of ten years from January 1, 1906; and the election of second party's wife as vice president for a like period, with succession to his wife or to whomsoever she may designate as such president in case of the death or disability of second party, which election has been made by first party;

*And whereas* for the good will of said business first party has agreed to pay second party, or his wife, the sum of twenty-thousand ($20,000) dollars yearly, during each and every year of said period of ten years, beginning January 1, 1906, provided the net earnings of the business for each year equal $20,000. If however, said earnings do not equal $20,000 the amount so to be paid shall not in any year exceed the amount of the net earnings for that year, before any dividends shall be payable on first party's capital stock; and first party has directed and authorized its officers to enter into a contract in that behalf.

*Now therefore* to that end it is mutually understood and agreed between the parties hereto as follows:

1. As a consideration for the good will of said business so sold by second party to first party, it has elected second party its president for a term of

ten (10) years, beginning January 1, 1906; also his wife vice president for a like period of time. In case of the death of second party, or his inability to act, before the expiration of said period of ten years, first party has and hereby does agree to cause the wife of said second party, or such other person as she may designate to be elected president of first party as the sucessor of second party for such unexpired period of ten years. First party further has and hereby does agree to pay to second party by way of compensation for the good will of his business so sold to it, the sum of twenty-thousand ($20,000) dollars, each and every year for the period of ten (10) years from January 1, 1906, provided the net earnings of the business for each year equal $20,000. If however, said net earnings do not equal $20,000 the amount so to be paid shall not in any year exceed the amount of the net earnings for that year, and that the same shall be payable to second party before any dividends shall be declared by first party on its capital stock.

*Provided, however*, that in case of the death of second party before the expiration of said period of ten years, then said yearly sum of $20,000 shall be paid to the wife of second party, or her estate.

2. In consideration of the election of second party to the office of president of first party and that of his wife as vice president for said period of ten years, and the provision of succession agreed upon in case of his death, and the prompt payment of said sum of $20,000 or the net earnings of said company as above provided in case they do not amount to $20,000 yearly to him for said period of ten years aforesaid, and in case of his death during said period, then the payment of a like sum to second party's wife or her estate. second party has and hereby does sell, assign and transfer to first party the good will of his said business so sold to it:

*In witness whereof* said parties have hereunto set their hands to triplicates hereof the day and year first above mentioned.

The POMPEIAN MANUFACTURING Co.<br>
By F. W. STECHER, *President.*<br>
JOHN COGAN, *Secretary.*<br>
F. W. STECHER.

4. The net earnings of the taxpayer exceeded $20,000 a year during the ten-year period provided in the agreement above set forth, and Stecher was paid $20,000 a year for each year, or a total of $200,000.

5. In conformity with the terms of its agreement with Stecher, the taxpayer issued to him 996 shares of stock of a par value of $99,600. One share was issued to each of Lue M. Stecher, wife of Stecher, A. McKee, John Cogan, and O. F. Leopold. Of the total capital stock $68,887.67 was issued for the good will and $31,112.33 for tangible assets.

6. In addition to the ten annual installments of $20,000 paid to Stecher, the taxpayer paid average annual dividends of 37.8 per cent on its capital stock.

7. At the annual meeting of the board of directors for each year, the payment of the $20,000 to Stecher was authorized out of the profits and the dividend for the past year ascertained. A typical example of the records of such meeting is as follows:

JANUARY 14, 1908.

On motion duly made and seconded, the board ordered the net earnings of the company for the year 1907 to be disposed of as follows: to wit: That there first be paid to F. W. Stecher the contract amount of the good will of the business; second, a dividend of 40 per cent of the capital stock of the company, the balance to be charged to undivided profits mentioned subject to the future action of other boards.

8. As the payments of $20,000 per year were made under the agreement of December 31, 1905, they were charged to expenses and designated as " good will paid on contract," and the minutes of the directors' meetings designated the payments as " contract amount for good will." Neither the total sum of $200,000, nor any other sum,

was set up as a liability or a capital expense upon the books of the company.

9. At the time the taxpayer corporation was organized and until his death in September, 1916, Stecher was in poor health. From 1905 to 1913, the business was managed and conducted by A. McKee, as manager, and, from the date of the death of McKee in 1913, to about January 1, 1916, Otto F. Leopold was in charge as manager. By this latter date, there had been a decided falling off in the business of the taxpayer. During this period, Stecher, although he was president of the corporation, devoted but little time or attention to the business and affairs of the taxpayer. Due to the falling off of the business of the taxpayer, it was decided, about January 1, 1916, that Stecher should take a more active part in the management of its affairs.

10. On January 5, 1916, and pursuant to the desire that Stecher give more active attention to the business, the taxpayer and Stecher entered into an agreement, as follows:

This agreement made and entered into at Cleveland, this 5th day of January, 1916, by and between F. W. Stecher, party of the first part, and The Pompeian Manufacturing Co., party of the second part.

Witnesseth:

That said party of the first part in consideration of the promises and agreements of said party of the second part herein contained hereby promises and agrees to continue in the employ of second party for a period of four years from the date herein written as the general manager of the aforesaid second party, and party of the first part agrees to perform the duties of that office.

In consideration whereof said party of the second part hereby promises and agrees to pay to said party of the first part or his heirs or legal representatives, the sum of $20,000 dollars per year payable in monthly installments of $1,000 dollars on the first day of each month during said period of four years and the balance due at the end of each year shall be paid on or before the 31st day of December of each year covered by this contract; however, in case the net earnings of the company do not amount to the total sum agreed to be paid as aforesaid, then shall deficiency be cancelled for that year, it being the intention to close up the salary account at the end of each year and further to pay as aforesaid to F. W. Stecher or his heirs or legal representatives the salary set forth for the term of four years, and this shall be considered an obligation rather than a personal salary.

In witness whereof the parties have hereunto set their hands this 5th day of January 1916.

F. W. STECHER.
THE POMPEIAN MANUFACTURING CO.
W. W. WHEELER.
O. F. LEOPOLD.

Witness:
CHARLES H. KAY.

Stecher dictated some new policies for the conduct of the affairs of the taxpayer, but due to his poor health devoted but very little time to attending to the business. Stecher and, subsequent to his death on September 27, 1916, his estate, were paid the sum of $80,000 in accordance with said contract.

DECISION.

The determination of the Commissioner is approved.

OPINION.

GRAUPNER: There are two issues in this case: (1) Whether or not the $200,000 paid to F. W. Stecher by the taxpayer in ten annual installments of $20,000 each, pursuant to the agreement of December

30, 1905, can properly be considered as having been paid for good will for purposes of invested capital; and, (2) whether or not the $20,000 per annum paid by the taxpayer during the years 1917, 1918, and 1919, to the estate of F. W. Stecher, under the agreement of January 5, 1916, is an allowable deduction for those years "as ordinary and necessary expenses" under the provisions of section 234(a) (1) of the Revenue Act of 1918. In both of the above cases the Commissioner took the position that the payments were, in fact, a distribution of net income.

We will first consider the item of $200,000 claimed as invested capital by the taxpayer. The proviso of section 207(b) of the Revenue Act of 1917 reads:

*Provided*, That * * * (b) the good will, trade-marks, trade brands, the franchise of a corporation or partnership, or other intangible property, shall be included as invested capital if the corporation or partnership made payment bona fide therefor specifically as such in cash or tangible property, the value of such good will, trade-mark, trade brand, franchise, or intangible property, not to exceed the actual cash or actual cash value of the tangible property paid therefor at the time of such payment * * *.

On casual inspection, the agreements and excerpts from the records of the taxpayer, as set forth in the findings of fact, would seem to sustain the contention of the taxpayer.

This is somewhat accented by the fact that, in addition to paying the $200,000 in 10 annual installments to Stecher, during the same period of time, the taxpayer paid average annual dividends of 37.8 per cent. An analysis of the transactions does not sustain the taxpayer's contentions.

In the original offer to sell by Stecher to the company it is provided:

DECEMBER 30, 1905.

I hereby offer to sell to your company for the sum of ninety-nine thousand, six hundred dollars ($99,600) the business heretofore now and now conducted [*sic*] in the name of Pompeian Manufacturing Co., at 92 Prospect Street, City, *including all its assets, stock manufactured, fixtures, trade-marks, copyrights, and leasehold of said business,* free of incumbrance * * *. (Italics ours.)

In the agreement of December 30, 1905, between the taxpayer and Stecher, it was provided:

And whereas said first party has issued to second party *by way of payment of purchase price the capital stock* of said second party proposed to be accepted by second party as such payment, and whereas said sale and purchase requires the election of second party as president of first party for a period of ten years from January 1, 1906, and the election of second party's wife as vice president for a like period, with succession to his wife or to whomsoever she may designate as such president in case of the death or disability of second party, which election has been made by first party * * * (Italics ours.)

It is undisputed that the value of the tangible assets transferred and set up on the books at that time was $31,112.33, and that the amount of the *good will* was $68,887.67. It would appear, therefore, from the records, that it was absolutely understood by and between the parties that the value of the good will was $68,887.67.

For a proper interpretation of the agreements we must look to those instruments and the subsequent actions of the parties. In interpreting the transactions we must bear in mind the situation of the parties. It must be borne in mind that, prior to the sale in 1905, Mr. Stecher was the sole proprietor and owner of the Pom-

peian Manufacturing Co. He also was practically the sole owner of the corporation. It was a close corporation. He owned 996 shares of 1,000 shares. The other four shares were issued to qualify the officers. In the sale of assets the parties were not dealing at arm's length. Mr. Stecher was in a position to dictate the terms. What terms did he impose? In his offer of sale he set forth three conditions: First, the price of $99,600 for the entire business; second, that he must be elected president and his wife vice president for 10 years, with provision for succession of wife in case of his death; and third, the corporation *must enter into an agreement* to pay him up to $20,000 per year from the first net earnings of the corporation.

On the same day that the corporation accepted and fulfilled these conditions, it issued to Stecher capital stock amounting to $99,600, elected him president for 10 years, and *made its agreement to pay* the $20,000 per year from the annual net earnings. Thereupon the taxpayer corporation became the absolute owner of the business, including the good will. It is well settled that "good will" can not be separated from the business. It goes with and is attached to the tangible assets. *Brass & Iron Works Co.* v. *Payne*, 50 Ohio St. 115; 33 N. E. 88; *Metropolitan National Bank* v. *St. Louis Dispatch Co.*, 149 U. S. 436, p. 446.

Good will seems to be used by the taxpayer in two senses, one, in the sense of capital expenditure allied to the tangible assets, the other, in the sense of "personal favor," "well wishes," etc., to be measured by the extent of the profits. The taxpayer very properly set up on the books the good will at $68,887.67 and capitalized this amount in addition to the tangible assets. The subsequent payments purporting to be for good will were not set up as a capital liability or expenditure, either before or after the payments. The distribution of profits and dividends was based entirely upon the original capitalization. These acts would seem to show conclusively that the parties did not regard the annual payments for good will in their true and correct sense.

The next question is to determine just what was the significance of the $20,000 payments. At the hearing a witness for the taxpayer testified on cross-examination as follows:

Q. You stated that in 1905 when the Pompeian Manufacturing Co. bought from Mr. Stecher this business, that it paid him $200,000 and 996 shares of stock. Is that what the agreement of December 31, 1905, says? In other words, did you pay Mr. Stecher $200,000 on December 31, 1905, for this business in addition to the 996 shares of stock?

A. We agreed to pay him that provided the earnings of the business would warrant it, and that the obligation was not to become cumulative, that if anything occurred that we would not earn $20,000 we would not have to pay him $20,000.

Q. You did not bind yourself to pay him a cent? You did not agree to pay him $200,000 or any other sum?

A. We agreed to pay him $20,000 a year if the earnings of the company made that much.

*        *        *        *        *        *        *

Q. How was this $200,000 treated on the books?

A. It was not placed on the books.

Q. It was not set up as a liability?

A. No; we did not know what the liability would be.

Q. You state that the corporation gave Mr. Stecher 996 shares of stock, par value of $100 a share for his business. What did his business consist of at that time? What was the value of the tangible assets?

A. The tangible assets about $22,000 plus.

Q. Do you know the exact amount?

A. I do not, but they are in the record.

Q. Do you know whether or not it was $31,112.33?

A. That is it. That is the figure.

Q. And the balance of the stock was considered as being issued for good will of the value of $68,887.67, if that is the difference between the first figure and the $100,000.00?

A. Yes; covering that item.

Q. How was this $20,000 treated on the books of this taxpayer during the years 1906 to 1917?

A. It was charged off as an expense, but not allowed by the examiner.

Q. Charged as an expense on your books?

A. Yes.

Q. What did you call it? Do you remember any designation you gave to it?

A. Good will, paid on contract.

Q. You charged it up to expenses and did not set up a capital account?

A. We did not.

If there were no profits, or a loss, Stecher would receive nothing under his agreement. In other words, the taxpayer is attempting to measure additional good will each year according to the amount of net profits up to $20,000. There was admittedly no liability on the part of the taxpayer unless a profit was realized, nor were the payments at any time set up as capital expenditures. Now, after the $200,000 has been paid, it is attempted to have the amount set up as invested capital. The taxpayer does not contend that the payments were for salary or compensation or expenses necessarily incurred in the business. What salary Stecher drew, if any, as president, is not disclosed. In the taxpayer's records, payments were set forth as "payment on good will per contract." Stecher, according to the allegations of the Commissioner, in his income-tax returns, sometimes referred to the payments as "royalties," sometimes as "dividends." The true purpose of the payments seems to be vague in the minds of the parties themselves. To our mind the only simple, logical, and consistent construction of the transaction is to consider the payments as a distribution of profits. The acts of both Stecher and the taxpayer corporation show that Stecher was really given a preferential right to the profits of the corporation up to $20,000 per year, and this preferred right was agreed to and acquiesced in by all the stockholders by agreement and by their acts. The evidence seems to indicate that, prior to the transfer of the business, Stecher was the sole proprietor and received all the profits of the business; that he organized his business into a corporation with active management in the hands of some of his former employees, but wished to insure to himself and wife the full ownership of the business as well as the profits, and had the agreements and records made accordingly. Whatever the designations of the payments were, the actual results and outcome were that he was to receive and did receive the profits up to $20,000 per year in addition to the regular dividends. This is further confirmed by the minutes of the annual meetings of the directors. They set forth the amount of the profits of the corporation for the preceding year. They then order $20,000 of these profits to be paid to Stecher. Then the regular dividends were declared, which dividends also, by virtue of the ownership of the stock, practically all went to Stecher. And while they called them "payments on contract for good will," the payments were in no way charged to capital. The whole arrangement and the transactions clearly show

that they were for the sole purpose of insuring to Stecher and his wife practically all the profits of the taxpayer. We are of the opinion that the Commissioner was correct in holding the amounts paid to Stecher as a distribution of profits, and as such were neither expense nor additions to invested capital.

The determination of the second issue raised by the appeal presents less difficulty in its solution. On January 5, 1916, Stecher and the taxpayer entered into another agreement for four years, during which he or his estate was to be paid $20,000 per year out of the first profits, if any. The agreement is set forth fully in paragraph 10 of the findings of fact.

Stecher died in September, 1916, after serving about nine months of this time. The balance of the payments were made in the years 1917, 1918, and 1919, to his estate. The taxpayer contends that these $20,000 payments to the estate were "ordinary and necessary expenses" as defined in section 12 (a) of the Revenue Act of 1917 and section 234 (a) (1) of the Revenue Act of 1918, which provide:

SEC. 234. (a) That in computing the net income * * * there shall be allowed as deductions:

(1) All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, *including a reasonable allowance for salaries or other compensation for personal services actually rendered* * * *. (Italics ours.)

It will be noted that this 4-year agreement commenced at the termination of the 10-year agreement, and we believe that our reasoning applied to the interpretation of the 10-year contract applies with equal force to this agreement. It will be further noted that this latter agreement recited that Stecher promises and agrees to *continue* in the employ of said second party as general manager and agrees to perform the duties of that office. This is at variance with the testimony of witnesses who stated that Stecher took no very active part and that another person held the title of general manager before this contract, and that even subsequently he took no very active part on account of his health, but dictated the policy of the company. To our mind this agreement, in effect, was a continuation of the former agreement, with the prime purpose of insuring to Stecher and his estate the profits of the taxpayer and giving him preferred rights to the profits up to $20,000 per year.

The wording of the contract and the subsequent treatment of the payments by the taxpayer show conclusively that the payments were not, in any event, regarded as ordinary and necessary expenses of the corporation for personal services actually rendered. The agreement set forth "this shall be considered an obligation *rather than a personal salary.*" A witness for the taxpayer testified:

By Mr. SMITH (member of the Board):

Q. How were those payments of $20,000 a year made to the estate of Mr. Stecher after Mr. Stecher's death in the year 1916, September, 1916, treated? Were they treated as salaries paid? How were they charged off?

A. The first year they were charged off as a salary expense. In fact, they were all charged off as expense items.

Q. But it was not charged to salary for 1917, 1918, or 1919?

A. I think not, just an expense item, *because we did not* know what kind of an expense it was after he was dead. I had to make out tax returns later on, and I did not know how to charge it off. It was an expense to us and we had to pay it. One year I entered it as an extraordinary loss. *The contract was*

*entered into, and we had to pay it.* It was a loss to the company as far as I could see. *We did not have his services any more.*

\* \* \* \* \* \*

Q. How did you treat these $20,000 payments in the income tax returns you filed for the years 1917, 1918, and 1919?

A. In 1916 we charged——

Q. 1917, 1918, and 1919?

A. In 1917 we—I didn't make a return of it, did not put it into our tax return, did not know what to do. In 1918 I put it in as an extraordinary loss. One year we did put it in and it was later disallowed.

Q. In 1919 you put it in as an extraordinary loss?

A. I think it was 1919. I am not quite sure. It was one of those years. (Italics ours.)

The difficulties in this case have arisen from the inconsistent and contradictory provisions of the agreements and records and the loose use of legal terms by the taxpayer. All these difficulties arising from apparent contradictions are removed when these payments are construed as a distribution of profits, which they obviously were. The determination of the Commissioner is approved.