The Vita-Food Corporation v. Commissioner.
Vita-Food Corp. v. Commissioner
Docket No. 45842.
United States Tax Court
T.C. Memo 1954-166; 1954 Tax Ct. Memo LEXIS 80; 13 T.C.M. (CCH) 926; T.C.M. (RIA) 54272; October 8, 1954, Filed George T. Altman, Esq., 233 South Beverly Drive, Beverly Hills, Calif., for the petitioner. James P. Powers, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in the petitioner's income tax, excess profits tax, and declared value excess profits tax and an addition to tax under section 291 of the Internal Revenue Code of 1939 as follows for the fiscal year ended October 31, 1943: Declared value
Income
Excess
excess profits
Addition
tax
profits tax
tax
to tax
$21,857.13
$9,061.24
$6,934.98
$2,265.31
Issue presented by the pleadings are the correctness of the respondent's action (1) in disallowing $20,320 of the deduction taken for compensation of an officer, (2) in determining the basis *81 of property sold by petitioner to Stuart Company during the taxable year, (3) in determining that an amount of $75,000 received by petitioner from the Stuart Company constituted ordinary income instead of capital gain, (4) in determining that the fair market value of certain payments of the total amount of $122,700 which the Stuart Company became obligated in the taxable year to pay to petitioner were to be regarded as income for that year, (5) in treating as capital expenditures certain expenditures made during the taxable year 1945, for the purpose of computing the amount of the net operating loss deduction for that year to be carried back to the fiscal year 1943, and (6) in determining an addition of 25 per cent to the excess profits tax for the taxable year for failure to file a timely excess profits tax return for that year. At the hearing the petitioner conceded issue No. (5). By an amendment to his answer, the respondent has moved that the deficiencies of $21,857.13 and $6,934.98 in the petitioner's income tax and declared value excess profits tax, respectively, be increased to $26,753.44 and $9,520.23, respectively, because of error committed by him in determining the petitioner's *82 basis for property sold by it to the Stuart Company during the taxable year 1943. General Findings of Fact The petitioner is a California corporation, formed on November 28, 1940, and has its principal place of business in Los Angeles, California. Its tax returns for the year involved were prepared on an accrual basis of accounting for a fiscal year ended October 31, and were filed with the collector for the sixth district of California. Maxwell H. Lewis was chiefly responsible for the organization of the petitioner. From 1933 until during 1940 he was employed by various governmental agencies handling relief work, particularly in connection with transient labor. This employment included certain studies regarding nutrition and on that subject he had occasion to consult Dr. Henry Borsook of the California Institute of Technology, who was an authority in the field of nutrition. Lewis and Dr. Borsook first became acquainted in 1929, at which time Lewis was operating a small chain of general mercantile stores. Thereafter they continued to be friends. In 1939 Lewis first became interested in vitamins. At that time he was one of a group of three who were serving as assistants to Dr. *83 Borsook in the preparation of an analysis of the nutritional requirements of a national defense program. This was a project voluntarily undertaken by the California Institute of Technology. About the middle of 1940, after completing his work with Dr. Borsook on the analysis of the nutritional requirements of the nation, Lewis went into the vitamin business. At that time vitamins were being sold individually and at high prices. Lewis' purpose, through the use of Dr. Borsook's formulas and standards as bases, was to produce a single mixed product containing in each dose all the known vitamin and mineral requirements for the human body which would sell at approximately one-tenth of the total of the then current prices for individual vitamins. In this he succeeded. With Dr. Borsook's assistance Lewis tested out numerous mixtures and submitted them to various institutions and physicians for their criticism as to taste and general suitability for intake into the human system. The products thus submitted bore no name label but only labels consisting of numbers and letters. The product was first manufactured at the California Institute of Technology and then at the home of a Dr. Ellis. Lewis *84 supplied all the materials and paid any assistants to Dr. Borsook that were required. At that time Dr. Borsook would accept no compensation. At a later time, and for the foregoing assistance and for assistance subsequently rendered, he accepted a total of $5,000 or $6,000, half of which he turned over to the California Institute of Technology and half he gave to his assistants. During the summer of 1940 Lewis was also engaged in getting an enterprise ready to supply a vitamin product to Charlie King, a reporter for the Pasadena Star News, who "covered" the California Institute of Technology, and to whom Lewis had agreed to supply the product. By the first part of October 1940, Lewis was doing "quite a bit of business" with King, supplying him with a liquid vitamin product called "Buoyant B," which King marketed. Lewis learned early in his dealings with King that the latter was not skilled in marketing, and he informed King that unless he got together a larger selling organization than he then had, he (Lewis) did not think he could continue very long to furnish him with the product. Thereafter King told Lewis that he had two acquaintances, William Pringle and Arthur Hanisch, the *85 latter described as a multimillionaire, who desired to go into the vitamin business. Subsequently, and during September or early in October 1940, Lewis met Pringle and Hanisch. At this meeting Lewis informed Hanisch of the requirements which he would have to meet in order for Lewis to furnish him vitamin products. These included a willingness and ability to enter upon a sales program nationwide in basis in which sales would be restricted, first, as an ethical product, to ethical drug outlets and second, as a proprietary product, to grocery stores, with sales in the latter class having a lesser mark-up in price structure than those usually required in the case of ethical drug outlets. Other requirements related to the prices to be paid by Hanisch for vitamin products, the prices to be charged by him on resale, the prepayment by Hanisch for vitamin products ordered by him, and a provision that the ownership of all trade-marks used on vitamin products sold to Hanisch was to be in Lewis. Subsequently, Lewis consulted his attorney, Paul Overton, about the mechanics of organizing a corporation for the manufacture of vitamin products and was advised that he should get some expression from *86 Dr. Borsook as to his willingness to participate and the extent to which he would permit the use of his name in connection with such an enterprise. Following a luncheon meeting of Lewis, Overton and Dr. Borsook, the latter on October 9, 1940, wrote Overton as follows: "Referring to the luncheon discussion yesterday with you and Mr. M. H. Lewis respecting some of the commercial aspects of the vitamin situation as we here observe it: I have given the matter considerable thought, as you requested, and conclude as follows. "That neither the Institute nor the Nutrition Group can be involved with the promotion of a private commercial enterprise. This, however, does not preclude our acting as consultants, under proper safeguards. I would consider it of great public benefit if you and Mr. Lewis proceeded with the commercial marketing of a low-cost vitamin product developed by our Nutrition Group. We would feel that public interest would be furthered by assisting such an enterprise in any scientific manner which would not come in conflict with the principles of the Institute or of the group as scientists. "Our interest would be predicated on satisfactory assurance that the marketable *87 item would be made available to the public at very low prices, far under those obtaining today; and under such circumstances, I would be disposed to undertake the scientific supervision and consultation necessary to ensure that the product contained approximate values as follows, per tablespoonful: "Vitamin A: 6,000 International Units Vitamin B Complex: 750 International Units, including B1 (thiamin chloride), riboflavin, nicotinic acid, biotin, etc. Vitamin C: 75 milligrams "As you know, such an undertaking, while providing the public with a vitamin product at extremely low cost, could simultaneously be made a very profitable private undertaking; and we, as stated, would feel disposed to encourage such an enterprise, and would be glad to answer all written or verbal inquiries with respect to the compound made under our supervision as consultants. "As also stated, I would regard Mr. Lewis' management of the enterprise as one of the prerequisites necessary to assurance of marketing practices and prices which are in the public interest." Thereafter, during October or November, and prior to the formation of the petitioner on November 28, 1940, Lewis and Hanisch reached a *88 general understanding as to the terms and conditions under which Hanisch would be furnished vitamin products which he, or he and his associates, would market on a nationwide basis. One of such terms or conditions was that the sale of the product known as "Buoyant B" then being sold by King would be discontinued. This provision was proposed by Hanisch with the acquiescence of King. The understanding was not reduced to writing at that time because Hanisch had not determined who his associates would be, or what corporations he might form and employ in the marketing program. Further, Lewis and Hanisch each desired to make an investigation as to the extent legislation in certain states prohibiting the sale of vitamin products by grocery stores, and the agitation for such legislation in certain other states, might affect the marketing program. Also, Hanisch requested that Lewis make an effort to improve the taste of the product then being produced. Such effort and improvement in taste were made prior to the formation of the petitioner. Following further conversations between Lewis and Hanisch, the petitioner on February 3, 1941, wrote a letter to Hanisch summarizing the various conversations *89 that had taken place with respect to Hanisch initiating a sales organization to market the vitamin product prepared by petitioner and the agreement reached as a result of said conversations. The letter set forth the vitamin content of the product, maximum retail price, the size of the containers, shipping dates and similar matters. In the letter petitioner acknowledged receipt of Hanisch's check for $23,510.40 in payment for the first order. The letter also contained the following: "It it also understood that the style of the label to be used on the package is to be selected by you, but to remain the property of this Corporation at all times. However, should the sales trial period be successful, and your organization determine to continue and enlarge its operations, the label chosen by you shall be restricted to the use of your organization alone, during such time as you continue to distribute this concentrate." On February 4, 1941, Hanisch confirmed and accepted the summarization contained in the letter from petitioner as representing the agreement or understanding arrived at through the discussions. Thereafter on May 5, 1941, petitioner entered into an agreement with Hanisch, *90 Shaler Food Products Company, sometimes hereinafter referred to as Shaler, and The Stuart Company, sometimes hereinafter referred to as Stuart, corporations which Hanisch had caused to be formed to market petitioner's vitamin product under the petitioner's trade-marks or labels, "Vitaplex" and "The Stuart Formula." Subsequently, Shaler was merged with Stuart and the marketing of the product under the trade-mark "Vitaplex" which was previously done through food stores by Shaler was discontinued. By an agreement entered into on November 28, 1942, by petitioner, Stuart and Hanisch the agreement of May 5, 1941, was cancelled and petitioner sold the trade-mark "The Stuart Formula" to Stuart. Except for accepting delivery of some unfilled orders of comparatively small amounts theretofore placed with petitioner, Stuart did not after November 28, 1942, acquire any further products from petitioner, but purchased its requirements elsewhere. After the sale of the trade-mark on November 28, 1942, the petitioner never operated at a profit. At some undisclosed time subsequent to November 28, 1942, the petitioner engaged in the ranching business, growing chickens, turkeys, cattle and hay, but these *91 activities proved unprofitable. Petitioner also attempted to develop the business of producing vitamin lemonade and vitamin cookies but was unsuccessful. The petitioner has never paid a dividend. Although the petitioner was formed on November 28, 1940, it issued no stock until February 4, 1941, on which date it issued 88 shares of its stock to Lewis and 12 shares to Paul Overton. For these shares the petitioner received $1 per share. For all shares thereafter issued the petitioner received $2 per share. All shares were no par value common stock and were paid for in cash. The following is a statement of the holdings of the petitioner's stock for the periods indicated: 2/4/41
2/15/41
2/5/42
3/11-13/42
8/20/42
10/2/42
to
to
to
to
to
to
2/15/41
2/5/42
3/11-13/42
8/20/42
10/2/42
12/27/49
Shareholder
Shares
Shares
Shares
Shares
Shares
Shares
M. H. Lewis
88
43
55
55
4,081
4,081
E. R. Lewis [1]
2,500
2,500
2,500
Paul Overton
12
12
Chas. I. Schottland
45
45
45
45
45
W. A. McBride
2,750
4,250
5,500
Phoebe Russell
4,000
4,000
4,000
Oscar Wiseman
500
500
500
Total Shares
100
100
100
9,850
15,376
16,626
*92 Issue 1. Compensation of officer Findings of Fact Lewis has been an officer in the petitioner since its inception. At a meeting of the petitioner's board of directors held on December 2, 1940, at which Paul Overton, Lewis and Mrs. Lewis were present, a resolution was adopted designating Lewis vice-president, treasurer and managing director of the corporation with authority to exercise all the powers of the president of the petitioner. His compensation in the foregoing capacities was fixed at a salary of $600 per month for the period January 1 through December 31, 1941. In addition, he was to receive a sum sufficient to pay his Federal and state income taxes on the compensation of $600 per month, computed on the basis that such compensation was net income over and above $10,000 other income. At said meeting Lewis was also employed as sales manager of the petitioner from the date of the meeting through December 31, 1941, with his compensation as such fixed at 10 per cent of the gross monthly sales of the petitioner. At a meeting of the board of directors of petitioner held on December 11, 1941, Lewis' employment as executive vice-president and sales *93 manager of petitioner was extended for the period January 1 through December 31, 1942, upon the same terms as contained in the resolution adopted by the directors on December 2, 1940. At a meeting of the board of directors held on June 2, 1942, and upon the representation of Lewis that the production problems of the petitioner had been stabilized and that he had several other interests to which he desired to devote more of his attention, and at his suggestion his compensation as sales manager for the period beginning July 1, 1942, and ending December 31, 1943, was fixed at 5 per cent of the gross monthly sales of the petitioner. Also, Lewis was given permission "to engage in whatever other activities he wishes" so long as "he continues to devote a substantial portion of his time in the interests of this corporation [petitioner] as its Sales Manager and as its Managing Director and Executive Vice President." The directors present at the meeting of June 2, 1942, were Lewis, Paul Overton, president of petitioner and attorney for Lewis, and Oscar Z. Wiseman, attorney for the petitioner. At this time the petitioner's 9,850 outstanding shares of stock were owned as follows: Shares
M. H. Lewis
55
Mrs. Lewis
2,500
Phoebe Russell, sister-in-law of Lewis
4,000
Oscar Z. Wiseman
500
W. A. McBride
2,750
Charles I. Schottland
45
Total
9,850
*94 McBride was an employee of the petitioner and his shares were purchased entirely with funds loaned to him by Lewis. Schottland was a long-time acquaintance of Lewis. He originally purchased his shares from Lewis for $45 with the intention of participating in the petitioner's business, but shortly after acquiring the shares on February 15, 1941, he left California for Washington, D.C., and took no part in the petitioner's business. On December 1, 1942, the board of directors of the petitioner adopted the following resolution: "RESOLVED, That the employment of M. H. Lewis as Executive Vice President and as Sales Manager of this corporation upon the terms and conditions as stated in resolutions passed by the Board of Directors of this corporation on December 2, 1940, are hereby re-executed and extended for the period from January 1, 1943 to and including December 31, 1943." Directors present at the meeting were Lewis, Overton and Wiseman. The stockholders in the petitioner were the same as at the time of the adoption of the resolution of June 2, 1942, except that Lewis had acquired an additional 4,026 shares and McBride, with funds loaned by Lewis, had acquired an additional 1,500 *95 shares. During the petitioner's fiscal years 1941, 1942 and 1943, Lewis as chief administrative officer of the petitioner directed and managed petitioner's business activities. The following is a statement of the compensation paid by petitioner to its officers for the years indicated: Year ended
Year ended
Year ended
Oct. 31, 1941
Oct. 31, 1942
Oct. 31, 1943
Paul Overton
$ 3,000.00
$ 3,000.00
M. H. Lewis
$19,853.18
42,511.03
39,783.03
Mrs. Lewis
3,000.00
3,000.00
3,000.00
Oscar Wiseman
1,350.00
$22,353.18
$49,861.03
$45,783.03 Paul Overton was president of the petitioner, presided at meetings of the board of directors, and rendered some legal service but did not participate in the actual operation of the petitioner. Mrs. Lewis was secretary of petitioner and Wiseman was a vice-president. Lewis' compensation for the indicated years was composed of the following items: Year ended
Year ended
Year ended
Oct. 31, 1941
Oct. 31, 1942
Oct. 31, 1943
Base salary
$ 6,000.00
$ 7,200.00
$ 7,200.00
Commission
13,853.18
27,235.77
12,263.03
Income taxes
8,075.26
12,500.00
Additional [1]
7,820.00
$19,853.18
$42,511.03
$39,783.03
*96 In its income tax return for the fiscal year 1941 the petitioner reported gross sales of $138,551.95, gross profit from sales of $61,568.05 and net income of $16,280 after deductions, including compensation paid officers. In its income tax return for the fiscal year 1942 the petitioner reported gross sales of $272,530.27, gross profit from sales of $118,378.42 and net income of $9,665.78 after deductions, including compensation paid officers. In its income tax return for the fiscal year 1943 petitioner reported gross sales of $204,552.96, gross profit from sales of $60,669.02 and net income of $11,361.77 after deductions, including compensation paid officers. In computing the reported net income of $11,361.77 the petitioner included in the total income an amount of $60,159.05 which was reported as gain from the sale or exchange of capital assets. In determining the deficiencies here involved the respondent determined that reasonable compensation *97 for the services rendered by Lewis to petitioner during its fiscal year 1943 was $19,463.03 and that the excess over that amount, $20,320, paid him for that year did not constitute an ordinary and necessary expense. Opinion In his notice to petitioner of his determination of the deficiencies in income tax, excess profits and declared value excess profits tax for the fiscal year 1943 involved herein, respondent also notified petitioner of his determination of overassessments in the petitioner's income and excess profits taxes for the fiscal year 1942, but made no determination of a deficiency in any tax for that year. In its petition, the petitioner alleged that the respondent erred in disallowing a portion of the deduction taken by it for the fiscal year 1942 compensation to Lewis. The allegation was denied by respondent. Since the respondent did not determine any deficiency in tax for the fiscal year 1942, we are without jurisdiction to consider respondent's action as to that year. Robert A. Pulfer, 43 B.T.A. 677, affd. 128 Fed. (2d) 742; Fisher v. Commissioner, 149 Fed. (2d) 540. The petitioner contends that the respondent erred in *98 not allowing a deduction in full for the fiscal year 1943 of the amount of compensation paid Lewis in that year. Although the petitioner submitted considerable evidence as to the services performed by Lewis for the fiscal years 1941 and 1942 and the amount of time devoted by him to the petitioner's business in those years, similar information was not furnished as to the fiscal year 1943. Aside from disclosing that in the fiscal year 1943 Lewis was, as in the prior two years, the chief administrative officer of the petitioner and directed and managed the petitioner's business, the record discloses little to aid in a determination of what would have been reasonable compensation to Lewis for the fiscal year 1943 which began on November 1, 1942 and ended October 31, 1943. On June 2, 1942, on the basis of representations made by Lewis as to his desire to promote certain personal interests, petitioner's board of directors reduced, effective July 1, 1942, his compensation as sales manager by reducing his commission from 10 per cent of sales to 5 per cent of sales. This reduction was to continue in effect until December 31, 1943. At the same time Lewis was given permission to engage in such *99 other activities as he wished so long as he as sales manager, managing director and executive vice-president of petitioner continued to devote "a substantial portion" of his time to the interests of petitioner. Under the foregoing action of the board of directors, Lewis could devote one-fourth, or less, of his time and meet the board's requirements for his compensation. It is true that on December 1, 1942, the board of directors extended Lewis' employment from January 1 through December 31, 1943, upon the terms and conditions stated in the board's resolution of December 2, 1940, which provided for a salary of $600 per month, allowances for state and Federal income taxes and a commission of 10 per cent on sales. However, there is nothing to indicate that Lewis was not to continue free to engage in such personal activities as he wished and was to receive the agreed compensation so long as he devoted only "a substantial portion" of his time to the affairs of the petitioner. In this connection it is to be noted that only three days before the board's action on December 1, 1942, the petitioner had sold its trade-mark "The Stuart Formula" to the Stuart Company. Except for a comparatively *100 small amount of unfilled orders by the Stuart Company, the sale of the trade-mark marked the end of the petitioner's business with the Stuart Company. Thenceforth, the petitioner never operated at a profit. A portion, $7,820, of the $39,783.03 paid by petitioner to Lewis as compensation for the fiscal year 1943 appears to have been a commission paid by petitioner, pursuant to the action of the petitioner's board of directors, in connection with the sale of "The Stuart Formula" trade-mark to the Stuart Company. The record fails to disclose that under its agreements with Lewis the petitioner was under any obligation to make such payment. Nor does the record otherwise show the necessity therefor. Furthermore, the reasons prompting the directors to authorize such payment are not disclosed. In view of the state of the record before us, we are unable to find that the respondent erred in determining that $19,463.03 constituted reasonable compensation for the services rendered by Lewis to the petitioner during the fiscal year 1943. Therefore, the respondent's action on this issue is sustained. Issue 2. Basis of property sold by petitioner to the Stuart Company Findings of Fact On *101 February 4, 1941, Lewis executed a bill of sale by which he conveyed to petitioner: "manufacturing rights in and to the liquid vitamin concentrate products known and to be trade-marked as 'Vitall' and under such other name or names as Buyer [petitioner] may designate and adopt from time to time, including the right to use the formulas therefor for liquid and tablet products, together with all Good Will attached to said liquid vitamin concentrate products and heretofore acquired by Seller [Lewis] in connection with his business heretofore done under his own name and under the name of General Vitamin Company. Buyer may make said liquid vitamin concentrates in such useful potencies as it may from time to time desire. Seller reserves rights to use the same formulas for tablet, capsule, or other solid or liquid vitamin products under another name or names. Provided further that: as to said reservation of rights Seller shall not, without the written consent of the Buyer first had and obtained, use the trade-mark or trade names of Buyer nor will he in any manner represent any products manufactured by him or permit others deriving rights to manufacture such products from him to claim *102 or represent that their products are similar in name or quality or connected with Buyer in any manner." As consideration for the conveyance, petitioner agreed to pay Lewis $78,200.95, which subsequently was paid in full. The initial payment, $8,200.95, was made by petitioner from funds received from Hanisch on an order for petitioner's product. At the time of the foregoing conveyance the name, "The Stuart Formula," had never been mentioned by anyone for use in connection with the manufacture and marketing of any vitamin product of petitioner. On March 7, 1941, the petitioner wrote Hanisch a letter acknowledging receipt from him of a check for $21,420 in full payment for a stated quantity of petitioner's vitamin product which, it was understood by the petitioner and Hanisch, would be sold by the latter "under the label 'Stuart's Formula' or 'The Stuart Formula' - 'The Exclusive Calplex Process'." Delivery of the order was to be made in approximately three weeks after receipt by petitioner of the necessary labels, caps, glassware and materials. By the agreement of May 5, 1941, between petitioner, Shaler, Stuart and Hanisch, heretofore mentioned in our General Findings of Fact, *103 Hanisch transferred the quantity of vitamin product he had purchased from the petitioner about February 3, 1941, to Shaler. The latter agreed to sell and distribute it under the petitioner's trade-mark or label "Vitaplex" and/or under such other of the petitioner's trademarks or labels as might be mutually agreed upon. By the agreement of May 5, 1941, Hanisch transferred the quantity of vitamin product he had purchased from petitioner about March 7, 1941, to Stuart which agreed to sell and distribute it under petitioner's trade-mark or label "The Stuart Formula" and/or under such other of the petitioner's trade-marks or labels as might be mutually agreed upon. By the agreement of May 5, 1941, the petitioner agreed not to sell its products to any person, firm or corporation other than Shaler and Stuart, except the product being marketed under the name "Vitall" in Los Angeles County, California. However, Shaler and Stuart were given the privilege of marketing "Vitall" outside Los Angeles County at prices identical with those quoted by petitioner in Los Angeles County. Furthermore, "Vitall" was not to be manufactured or sold by petitioner on a competitive basis more advantageous than *104 "Vitaplex" or "The Stuart Formula." Stuart was given the privilege of taking orders at any time for "Vitall" in Los Angeles County and, under certain circumstances, it and Shaler could acquire the exclusive distribution rights of "Vitall" in Los Angeles County. Stuart and Shaler agreed not to handle products other than those produced by petitioner. They also agreed to undertake and carry on at their own expense a sales campaign for the purpose of creating and maintaining a market for the vitamin products produced by petitioner and marketed by them. All costs and expenses theretofore incurred or thereafter occurring for printing, lithography, color work, advertising, postage, advertising agency fees, commissions and expenses in connection with the marketing or advertising of any of the products were to be paid by Stuart, Shaler and Hanisch, except that the cost of printing labels to be affixed to the products purchased by Stuart and Shaler was to be borne by petitioner. The agreement further provided that any and all trade-marks or labels under which the products manufactured by petitioner and marketed or distributed by Stuart and Shaler were sold should at all times remain the exclusive *105 property of the petitioner. Subsequent to May 5, 1941, Shaler, which was to market "Vitaplex" through food outlets, such as grocery stores, with promotional endeavors directed toward the consumer, and Stuart, which was to market "The Stuart Formula" through "ethical" channels with promotion work directed toward doctors and no advertising directed at the consumer, put on promotion campaigns at their own expense. Sales of the product by Shaler through food outlets were not successful and that corporation subsequently was merged with Stuart. On June 23, 1942, the petitioner filed with the State of California, a "Claim for Trade Mark" for "The Stuart Formula." On September 8, 1942, the trade-mark "The Stuart Formula" was registered to petitioner in the United States Patent Office. On November 28, 1948, petitioner, Stuart and Hanisch entered into an agreement whereby, among other things, the petitioner sold the trade-mark "The Stuart Formula" to Stuart. During its fiscal year 1941, and following the execution by Lewis of the bill of sale of February 4, 1941, whereby he conveyed to the petitioner the property recited therein, the petitioner set up on its books as a capital item, *106 representing "Goodwill, formulas, etc.," an amount of $78,350.95. That amount included $78,200.95 payable to Lewis under the bill of sale and an additional amount of $150 representing the cost of registering the trade-mark. No other amount or amounts with respect thereto were ever capitalized by petitioner. With respect to the sale of "The Stuart Formula" trade-mark, the petitioner, in its return for the fiscal year 1943, reported the sale of "Formula & Trade Mark" showing the cost or other basis thereof as $138,340.95. In determining the deficiencies for 1943 the respondent determined that there was no basis in fact for including an amount of $60,000 in the $138,340.95, that petitioner did not sell to Stuart all the assets it acquired from Lewis on February 4, 1941, and that of the cost of the assets then acquired, $19,585.24 was allocable to those sold to Stuart. Opinion The petitioner takes the position that on November 28, 1942, it sold to Stuart the trade-mark or trade name, "The Stuart Formula," and the good will attaching thereto, that the cost of such good will was the $78,200.95 paid to Lewis under the bill of sale of February 4, 1941, and additional capital outlays *107 to bring that amount to $78,340.95, and that the respondent erred in not determining the latter amount, instead of $19,585.24, to be the cost of the property sold to Stuart on November 28, 1942. By an amended answer the respondent has moved to increase the deficiencies in income and excess profits tax on the ground that the property sold by petitioner to Stuart on November 28, 1942, had no cost or other basis to the petitioner and that, accordingly, he (respondent) erred in determining that it had a basis of $19,585.24 in determining the petitioner's gain from the sale. In this connection the respondent concedes on brief that the cost of registering "The Stuart Formula" trade-mark with the United States Patent Office and with the State of California was properly chargeable to the trade-mark, and that, accordingly, the trademark had a basis of $150 in the hands of the petitioner. He contends that no greater amount than $150 is allowable as the basis of the property sold. In support of its position as to the basis of the property sold to Stuart, the petitioner states that the trade-mark "Vitall," under which Lewis, and later it, sold the vitamin product, was subject to so many interferences *108 that it could not be protected by registration and that there was never any promotion of the product under that name; that the sale of "Buoyant B," another name for the same product sold under the name of "Vitall," had to be abandoned as a condition for Hanisch's agreement to market petitioner's products, and that therefore the only thing purchased under the bill of sale of February 4, 1941, which had any value, or which acquired any existence as property of the petitioner, was the good will acquired from Lewis. The petitioner further urges that the good will so acquired from Lewis consisted of his (Lewis') contacts with the California Institute of Technology and Dr. Borsook, their approval of the product he had developed and his price determinations and marketing practices; the approval and acceptance by hospitals and physicians of his product, though only in the form of test samples bearing no name but only numbers; and his contact with Hanisch and the latter's approval of the venture and his readiness to market the products. Petitioner further urges that it was to the foregoing which it claims to have acquired from Lewis, that the trademark "The Stuart Formula" was attached, and *109 that the two became fused into a single property. The bill of sale recited that Lewis there-by conveyed to petitioner: "manufacturing rights in and to the liquid vitamin concentrate products known to be trade-marked as 'Vitall' and under such other name or names as Buyer [petitioner] may designate and adopt from time to time, including the right to use the formulas therefor for liquid and tablet products, together with all Good Will attached to said liquid vitamin concentrate products and heretofore acquired by Seller [Lewis] in connection with his business heretofore done under his own name and under the name of General Vitamin Company. * * *" In addition to the foregoing the bill of sale further provided that: "Seller reserves rights to use the same formulas for tablet, capsule, or other solid or liquid vitamin products under another name or names. * * *" In connection with the latter provision there was the further provision that, without the consent of petitioner first obtained, Lewis would not use the trade-mark or trade names of the petitioner and that he would not, and would not permit others deriving from him manufacturing rights to such products to, claim or *110 represent that their products were similiar in name or quality or were connected with the petitioner in any way. From a consideration of the bill of sale, we find nothing to indicate that Lewis thereby purported to convey to petitioner any right to the use of the name "Buoyant B" employed by him in connection with the vitamin products he sold to King. Consequently, no portion of the consideration paid by petitioner to Lewis in connection with the bill of sale appears to relate to the name "Buoyant B." As a result the petitioner in agreeing to the condition that the sales of "Buoyant B" would be discontinued in order to obtain the agreement of May 7, 1941, with Hanisch appears to have parted with nothing. Nor do we think that the remainder of the position taken by petitioner can be sustained. First, the record fails to show that the vitamin business of Lewis had any good will. So far as appears, King was his only customer and Lewis had found him to be unsatisfactory. Furthermore, the record fails to show that any profits were realized by Lewis from his manufacture and sale of vitamin products prior to the execution of the bill of sale on February 4, 1941. Nor does the record indicate *111 what amount of profits, if any, the petitioner realized from the manufacture and sale after that date of vitamin products sold under a name or names or a number or numbers employed by Lewis prior to February 4, 1941. Since, so far as shown, losses were sustained in each instance, it would appear that his business had no good will and that, therefore, he could transfer none to the petitioner. Neither the bill of sale nor other evidence of record indicates that Lewis sold or conveyed his vitamin products business to petitioner or anyone else. Nevertheless, by the bill of sale he purported to carve out and convey to petitioner whatever good will, if any, the business had. As was said in Dodge Brothers v. United States, 118 Fed. (2d) 95: "Good will cannot be carved out of a business and sold independently of the going concern; for its tangibility and its value exist only to the extent that such tangibility and such value are connected with a going business. See Metropolitan National Bank v. St. Louis Dispatch Co., 1893, 149 U.S. 436, 446, 13 S. Ct. 944, 37 L. Ed. 799, citing Story on Partnerships § 99; Betts v. United States, 1926, 62 Ct. Cl. 1, 8. *112 " While it is true that Lewis was the chief managerial officer of the petitioner and had the various acquaintanceships or contacts relied on by petitioner, these did not constitute good will as an item of property, nor did they exist in such form that they could be the subject of transfer. Danco Co., 14 T.C. 276, and cases there cited. The trade-mark "The Stuart Formula" was both adopted by petitioner and first used by it sometime after the execution of the bill of sale on February 4, 1941. Stuart, at its own expense, promoted the marketing of the product obtained from petitioner under the name of "The Stuart Formula." The trade-mark "The Stuart Formula," although the property of the petitioner, acquired its value from the promotion and sale of the product under that name by Stuart. In view of what has been said above, we conclude that no part of the amount paid to Lewis under the bill of sale is to be allocated as the basis of property sold by petitioner to Stuart on November 28, 1942. However, in view of the concession of respondent mentioned above, we hold that the property sold to Stuart on said date had a basis of $150. Under an alternative pleading denied *113 by respondent, the petitioner takes the position that all it acquired at the cost of $78,340.95 ceased to exist as its property when it sold "The Stuart Formula" trademark and good will attaching thereto to Stuart and that, therefore, any portion of that amount not found herein to be properly assignable to said trade-mark and good will should be allowed as a loss due to worthlessness occurring during its taxable year 1943. The petitioner makes no serious argument in support of its position and, so far as we are able to ascertain, it rests its position on the ground that after it sold "The Stuart Formula" trade-mark to Stuart it did not, and could not, manufacture and sell any vitamin product as having the scientific sponsorship and professional acceptance which had become attached to that trade-mark, and that while it thereafter tried other ventures, it was not able to operate any of them at a profit. While Lewis testified that after the sale of "The Stuart Formula" trade-mark, the petitioner was not able to use in the conduct of its business the scientific sponsorship built up around that trade-mark without appearing in a questionable light, he further stated that while most doctors *114 were interested in Dr. Borsook's connection with "The Stuart Formula" and knew that petitioner, not Stuart, manufactured the product, no attempt was made by petitioner after the sale of the trade-mark and after petitioner ceased manufacturing the product for Stuart to notify them that Dr. Borsook and petitioner were no longer connected with the manufacture of the product. After the sale on November 28, 1942, of "The Stuart Formula" trade-mark, petitioner appears to have continued to own all the manufacturing rights and other property acquired from Lewis under the bill of sale. Just what use they were put to during the remainder of the taxable year 1943 and later years is far from clear. In its income tax return for the fiscal year 1945 the petitioner described its business as that of manufacturing vitamin food products. This was the same description as that given in its returns for the fiscal years 1941 through 1944. In this situation, and in the absence of a showing of abandonment in the fiscal year 1943, we are unable to find that petitioner sustained any deductible loss with respect to the property in question. Issue 3. Nature of $75,000 received by petitioner from Stuart Company *115 under a contract Findings of Fact The agreement of May 5, 1941, between petitioner, Shaler, Stuart and Hanisch fixed the prices at which the petitioner was to sell its products to Shaler and Stuart and the retail prices at which such products were to be distributed. The agreement also provided for an increase in petitioner's selling prices from time to time in event production costs and taxes increased. In such event, Shaler and Stuart were to become entitled to increase the retail prices proportionately. Payment by Shaler and Stuart for products purchased from petitioner was to be as follows: One-half the purchase price to accompany the order and the remainder within 3 days after delivery of the products. During the time when orders exceeded a daily average of 2,000 pint bottles of products or the equivalent the required payment to accompany the order was one-fourth the purchase price with the balance to be paid within 3 days of delivery of the products. Shaler and Stuart were to handle no other products than those manufactured or produced by petitioner. With certain exceptions not here material, they were to be the sole distributors of all products manufactured or produced *116 by petitioner. Provisions of the agreement of May 5, 1941, relating to the life thereof and the manner of cancellation were as follows: "6. First parties [Shaler and Stuart] shall have the exclusive right to sell said VITAPLEX and STUART FORMULA until November 1, 1941. Such right shall continue thereafter until and unless terminated by written notice from second party [petitioner], provided, however, that such termination shall not become effective until and unless during any sixty day period between said November 1, 1941, and May 1, 1942, the combined purchases of such products by first parties from second party shall not have averaged fifteen hundred pints per day, or unless during any sixty day period after said May 1, 1942, such purchases shall not have averaged two thousand pints per day; and, provided further, the date of any such termination shall be not less than sixty days from and after such notice of termination of said right. In determining performance hereunder consideration shall be given to purchases by first parties from second party of any other products on a dollar basis at the prices paid therefor. First parties shall not be held to strict performance hereunder *117 if such failure is due to conditions beyond their control, such as adverse legislation, strikes and/or delays in transportation. * * *
"19. This contract shall remain in full force and effect for the period of ten years from and after the date hereof, and may be extended at the option of first parties for an additional period of ten years by written notice to second party, such notice to be given not less than three months before the expiration of said first ten-year period, provided, however, that this contract may be terminated by second party if for any sixty consecutive days, at any time after November 1, 1941, first parties shall not have purchased the minimum quantities of products hereinbefore specified in paragraph 6 (Six) hereof, upon sixty days notice of intention so to do, unless during such sixty-day period any such deficiency shall be removed and the minimum quantities aforesaid ordered and paid for; otherwise, all rights of first and third [Hanisch] parties hereunder shall cease at the expiration of the sixty-day period specified in such notice of termination." The agreement of May 5, 1941, also provided that any dispute arising either in the interpretation *118 or the performance thereof should be adjusted by arbitration under a stated procedure, that the decision of the board of arbitrators might be enforced as an arbitration award in the manner provided by the Code of Civil Procedure of the State of California, and each party (to the agreement) expressly consented to the procurement of judgment based upon such award. After entering into the agreement of May 5, 1941, Stuart objected to the retail prices fixed in the agreement as being too low and requested changes in such prices. Petitioner acquiesced in the requested changes. Stuart received complaints from its customers relative to the product sold under the name of "The Stuart Formula." The product was considered too thick and its taste too sweet. The ingredients tended to separate, with some of them settling to the bottom of the bottle. The most serious complaint was as to the bottles of the product exploding on the shelves of drug stores and damaging other merchandise. Such explosions were caused by gas forming in the bottles and expanding. Although petitioner attempted to correct the situation by providing a vented cap in the bottle, which was intended to allow the gas to escape, *119 this was not entirely successful because the pressure of the gas would force the liquid out through the vent. While the petitioner paid for the damages sustained by the retailers by the bottles exploding or by their failure to retain their contents, these incidents detracted from the prestige of the product. Other complaints received by Stuart related to the product sold in tablet form. Bottles produced and marketed as containing 96 tablets would actually contain one or two tablets less than that number. While the agreement of May 5, 1941, required Stuart at its own exepnse to undertake and carry on an appropriate sales campaign for the purpose of creating and maintaining a satisfactory market for the product to be handled by it, Lewis considered that the sum allotted by Stuart for such campaign was insufficient to provide an adequate geographical coverage. Lewis felt that they had "one golden opportunity; that this was the way of the future, as far as the vitamin business was concerned, and unless it was seized at its beginning, the benefits wouldn't accrue." He thought Hanisch moved slowly and inadequately in getting out a national program and it was a matter of friction between *120 them. The plant at which petitioner's products were manufactured was a former broom factory. At the time Hanisch first became interested in distributing such products he desired to examine the plant but was not permitted to do so on the ground that no one except the workers and Government food inspectors was allowed in the plant. After the formation of Shaler and Stuart about March 1941 Hanisch gave Lewis 15 per cent of the stock of each corporation, and in doing so expressed the hope that this would improve the relations between the petitioner and those corporations and that Lewis would act as liaison between them. Lewis was an officer of Stuart in 1941 and 1942. In explanation to Lewis of a "drag" in sales of Stuart during a part of 1942, Hanisch stated that he did not intend to promote the Stuart's sales program unless petitioner gave him a 50 per cent interest in "The Stuart Formula" trade-mark and he was given some shares of stock in petitioner. The petitioner would not consent to these proposals. Stuart sought the advice of trade-mark counsel on the question of whether petitioner or Stuart had legal title to "The Stuart Formula" trade-mark. Three firms of attorneys were *121 consulted and conflicting opinions were received. On October 8, 1942, the petitioner sent the following letter: "The Stuart Company, Shaler Food Products Company, Arthur Hanisch, Pasadena, California
"Regarding: Contract of May 5, 1941, between Shaler Food Products Company and The Stuart Company, First Parties, The Vita-Food Corporation, Second Party, and Arthur Hanisch, Third Party. "Gentlemen: "In view of the position expressed by Mr. Hanisch for the First Parties concerning national distribution, its development and organization, and as to your defaults in performance of the above described contract, we invoke the intermediate step provided in paragraph 6 of the contract. You have failed substantially to meet your agreed commitments, although additional time has been granted to you by prior quota suspensions. "You are each hereby notified that you have failed to meet your quotas for the sixty-day period from and after August 1, 1942, and therefore your exclusive right to sell under the said contract is hereby terminated in accordance with paragraph 6 thereof. This termination shall be effective sixty (60) days after the service of this notice. In all other respects, *122 the contract remains in full force and effect." Petitioner's counsel, one of whom prepared and signed the foregoing letter on behalf of petitioner, had not advised petitioner that continuation of the contract in effect "in all other respects" was necessary to protect petitioner's interest in "The Stuart Formula" trade-mark. Upon receipt of petitioner's letter of October 8, 1942, Stuart conferred with counsel and was advised that petitioner was attempting to cancel only the exclusive distributorship clause of the contract and to continue in force the remainder of the contract so that Stuart and Hanisch, personally, could remain in the pharmaceutical business only if they continued to buy from petitioner. On October 12, 1942, Stuart sent the following letter to the petitioner: "The Vita-Food Corporation, 356 South Spring Street, Los Angeles, California
"Gentlemen: "This will acknowledge receipt of your notice of cancellation in six counterparts delivered by registered mail October 9, 1942. "We shall endeavor to the best of our ability to reinstate the contract dated May 5, 1941 by removing the shortages in quotas. However, in fairness to you, we should inform you that we *123 do not believe this will be possible. "If we are unable to reinstate the contract we shall regard it as terminated for all purposes, at the expiration of 60 days from date of notice, in accordance with the provisions of Paragraph 19 thereof which incorporates Paragraph 6 of the contract. "You having given notice of termination the same is accepted in accordance with the provisions of the contract and we do not concede the existence of any such intermediate procedure as you suggest. No attempt on your part to withdraw the notice will be recognized. "Yours very truly, "THE STUART COMPANY for itself and as successor to SHALER FOOD PRODUCTS COMPANY
"by /s/ Donald V. Hops President" "The undersigned Arthur Hanisch who is a formal party only to said agreement of May 5, 1941 joins herein to acknowledge receipt of a notice addressed to him. "/s/ Arthur Hanisch" The following is an excerpt from the minutes of a meeting of the petitioner's board of directors held on October 23, 1942: "The matter of the default of The Stuart Company on the contract dated May 5, 1945 was brought on for discussion; upon motion duly made, seconded and carried, the following resolution was adopted. *124 Resolved that the action taken by Oscar Z. Wiseman as vice-president of this corporation in serving notice of default upon The Stuart Company under date of October 8, 1942 is hereby ratified and approved. A copy of said notice is attached to these minutes and made a part hereof. Oscar Z. Wiseman or M. H. Lewis, the managing director of this corporation, are hereby authorized to take any and all necessary further steps, including the prosecution or defense of any litigation that may ensue therefrom. Oscar Z. Wiseman is further authorized to settle said litigation, and/or sell 'The Stuart Formula' trademark." On November 25, 1942, petitioner instituted in the Superior Court for Los Angeles County, California, an action for an injunction against Stuart, Hanisch and others. As basis for the action, it was alleged that the defendants were preparing to acquire products from a manufacturer other than petitioner and to sell them under the name "The Stuart Formula." A temporary restraining order was granted and December 4, 1942, was set for the defendants to show cause why they should not be enjoined during the pendency of the action. Pending hearing on the order to show cause, the temporary *125 restraining order enjoined the defendants from selling vitamin products under "The Stuart Formula" trade-mark except such products as were manufactured by petitioner. Subsequently, Oscar Z. Wiseman, an attorney, on behalf of petitioner, and Robert Dunlap, counsel for Stuart and Hanisch, in their behalf, entered into negotiations, in which Hanisch later joined, which resulted in an agreement entitled "Agreement of Settlement of Litigation and Cancellation of Contract." Said agreement was executed by petitioner, Stuart and Hanisch on November 28, 1942. Pertinent portions are as follows: "It is hereby agreed by and between The Vita-Food Corporation, first party, The Stuart Company, second party, and Arthur O. Hanisch, third party, as follows: "Whereas an action is now pending in the Los Angeles County Superior Court by first party as plaintiff against second and third parties and others as defendants, being Action No. 482045, and Whereas the parties hereto did on May 5, 1941, execute an agreement in writing to which reference is hereby made for full details, and Whereas the parties hereto desire to settle and adjust all their disputes and differences against and with each other *126 whether involved in said pending litigation or otherwise, so that said action can be dismissed, said contract cancelled and terminated, and Whereas said litigation involves the dispute, among other things, as to the claim of second party to the ownership of a trade mark, 'The Stuart Formula', which trade mark second party claims to own, and Whereas second party desires to maintain the continuity of the present market therefor, and Whereas first party in addition to the covenants of the second and third party herein and as a part thereof relies upon the personal ability of third party as managing agent of second party, "NOW THEREFORE IT IS AGREED: "1. First party agrees to dismiss with prejudice said action No. 482045. All parties hereto agree that the said agreement of May 5, 1941, is hereby cancelled and terminated as fully and to the same extent as though the same had never been executed, and all parties hereto hereby waive and release any and all claims and demands of every kind, character or description which any thereof have, or may have or claim to have against any thereof, or the officers, agents, or employes of any of them, whether by reason of said contract or otherwise. *127 * * * "2. First party quitclaims without warranty (except that it does warrant that it has not heretofore conveyed assigned or encumbered any right therein) to second party the trade mark 'The Stuart Formula.' First party agrees to execute appropriate assignments, if requested, of registrations on file with the Secretary of State of the State of California and the U.S. Commissioner of Patents. "3. Second and third parties agree to pay to First Party the sum of $75,000.00 as follows: $35,000.00 upon the execution of this agreement, receipt of which is hereby acknowledged by first party, and $40,000.00 payable at the rate of $4,000.00 per month as per note executed concurrently herewith, which note shall be an obligation independent of but not in addition to the above amount. "4. Second party agrees to pay to first party on a royalty basis and as additional consideration for the execution of this agreement the sum of $122,700.00 which sum is additional to the above mentioned $75,000.00. The said $122,700.00 shall be paid at the rate of 7 1/2 cents per unit of vitamin concentrates as sold and marketed by second party beginning October 1, 1943, and continuing until the said sum of *128 $122,700 is fully paid. A unit of vitamin concentrates is hereby defined and agreed to be the equivalent of one pint or 96 tablets of the product now being sold and marketed under the trade mark 'The Stuart Formula' at the potencies now in effect in the Stuart Formula liquid. Such payments shall be paid on the equivalent of the said unit of vitamin concentrates whether the same shall hereafter be sold and marketed in liquid, tablet, or in any other physical form or whatever the size of the package or packages by second party whether sold under the trade mark The Stuart Formula or not. * * *
"5. Third party represents and warrants that he is the owner and will retain and maintain the ownership of 51% or more of the outstanding capital stock of second party until first party is fully paid in accordance with this agreement, and he further represents and warrants that he is the managing agent in full charge of the business and affairs of second party. Should third party at any time fail to maintain his said stock ownership and control or fail up to and including October 15, 1946, to continue as said managing agent of second party, then and in either such event, third party will *129 forthwith pay to first party the then outstanding balance remaining unpaid to first party on said note (per paragraph 3 hereof) and unpaid on said sum of $122,700.00 as provided in paragraph 4 hereof. * * * "6. Second and third parties agree that if prior to full payment of the sums agreed to be paid to first party in accordance with paragraphs 3 and 4 hereof either (a) the business of second party is sold or (b) the good will of the business of second party is sold or (c) the trade mark 'The Stuart Formula' is sold or licensed by second party to any other person, firm or corporation, or (d) an attempt is made by second or third party to do any of the acts in this paragraph 6 specified, then, and in any such event, the balance remaining unpaid upon the obligations of second party set forth in par. 4 hereof shall become forthwith due and payable by second and third parties jointly and severally to first party. "7. In the event of the abandonment of said trade-mark 'The Stuart Formula' by Second Party or of the insolvency or bankruptcy of second party the trade mark 'The Stuart Formula' and all registrations thereof shall vest in and be the property of first party. * * * "8. Arthur *130 O. Hanisch third party covenants and agrees that until full payment of the sum specified in paragraph 4 hereof he will not pledge or assign his stock in second party so as to reduce his holdings to less than 51% of the capital stock of second party. Third party understands and agrees that his obligations herein set forth are primary upon him with reference to the provisions set forth in paragraphs 3, 5, 6 and 8 but not paragraph 4, except as referred to in paragraphs 5, 6, and 8, and not merely those of guarantor or surety. "9. Second and Third parties hereby waive and relinquish to and in favor of First party any claims or interest that they or either of them may have in and to the trade marks named as follows: 'Vitall', 'Calplex' 'Made by the Calplex Process', 'Buoyant B' and 'Vita-Diet.' * * *
"11. It is understood that nothing herein contained shall prevent the parties hereto from competing with each other, but it is agreed that no party shall intentionally harm either of the other parties save and except that the results of normal fair competition shall not be construed as 'intentional harm'. Second and third parties jointly and severally agree not to make or permit any *131 representations to be made that Henry Borsook and/or California Institute of Technology have or will have connection with them or either of them or with the trade mark 'The Stuart Formula' or any vitamin concentrates produced, marketed or sold by them or either of them. "12. First party hereby assigns to third party whatever capital stock of second party and/or Shaler Food Products Company now standing in the name of Max H. Lewis, which is represented by certificates now in possession of second party." Although only $197,700 ($75,000 plus $122,700) is mentioned in the foregoing agreement, the total consideration was $200,000. The difference of $2,300 consisted of a payment previously made by Stuart to the petitioner on an order for merchandise. Stuart paid all amounts due under the agreement of November 28, 1942. When Stuart severed its relationship with petitioner on November 28, 1942, it found available from another pharmaceutical company a product identical in vitamin content with that previously supplied by petitioner and at a price of approximately 30 cents per bottle less than that charged by petitioner. The difference between the two formulas was the substitution of *132 a malt base for the molasses base formerly used. Subsequently, Stuart had some trouble of an undisclosed nature with the Food and Drug Administration about the malt base formula. The following is a statement of Stuart's sales, costs of goods sold and net income or loss as shown by its income tax returns for the years indicated: Year ended
Cost of
Net income
March 31
Sales
goods sold
or loss
1942
$ 223,124.50
$154,271.48
[6,462.14)
1943 [1]
426,016.25
256.954.39
(962.80)
1944
643,122.27
314,924.77
7,740.04
1945
1,073,750.28
509,340.53
17,323.25
In connection with the transactions effected by the agreement of November 28, 1942, the petitioner reported in its income tax return for the taxable year 1943 the sale for $200,000 of "Formula & Trade Mark," the gain computed being shown as long-term capital gain. In determining the deficiencies for said year, the respondent determined that $75,000 of the total consideration of $200,000 flowing to petitioner under the agreement of November 28, 1942, was consideration *133 received by petitioner for the cancellation of the agreement of May 5, 1941, and constituted ordinary income and that the remaining $125,000 represented receipts from the sale of "The Stuart Formula" trade-mark. Opinion The issue involved here relates only to the $75,000 which the respondent determined was paid to petitioner by Stuart for the cancellation of the agreement of May 5, 1941, and was ordinary income. Taking the position that its letter of October 8, 1942, to Stuart effected a termination of the agreement of May 5, 1941, and that Stuart's reply thereto on October 12, 1942, shows that Stuart also regarded the agreement as then terminated, the petitioner contends that on November 28, 1942, the agreement of May 5, 1941, no longer had any existence and that, therefore, there was no contract to cancel. Petitioner further contends that such being the situation the entire $200,000 received by it from Stuart was payment for "The Stuart Formula" trade-mark. Although making the foregoing argument, petitioner admits on brief that pursuant to the terms of the agreement of May 5, 1941, termination of that agreement was not to become effective until the expiration of 60 days following *134 its letter, or until December 8, 1942, and would not become effective then in event Stuart prior thereto made sufficient purchases to remove its defaults in quotas. Since this admission is in conformity with the terms of the agreement of May 5, 1941, we think that that agreement was not only still in existence but was also in effect on November 28, 1942, and must be so regarded for the purposes of the decision of the question presented here. The respondent contends that in the situation presented it is only fair and reasonable to conclude that some amount was paid by Stuart to petitioner for the cancellation of the agreement of May 5, 1941, which from Stuart's standpoint was "bad" or onerous, and that his determination that $75,000 was paid for that purpose is fair and reasonable. A review of the situation existing in November 1942 discloses that by reason of its agreement with Stuart the petitioner, with only a comparatively small capital, was, and had been, operating at a profit after payment to its managing officer of compensation of approximately $40,000 a year. Stuart was, and had been, operating at a loss. From the terms under which petitioner sold its product to Stuart it *135 is apparent that Stuart made substantial cash payments before receiving any deliveries on its orders. In addition, Stuart financed the promotion, advertising and marketing of the product. Friction had arisen between Lewis and Hanisch, president of Stuart, because of the latter's refusal to cause Stuart to expend much greater sums for promotion and advertising than it was spending. Friction also existed between petitioner and Hanisch because of the latter's desire to acquire an interest in "The Stuart Formula" trade-mark and also some stock in the petitioner and the petitioner's refusal to accede to such desire. Stuart also had experienced complaints both as to petitioner's liquid or bottled product and its tablet product. Considering the foregoing in connection with petitioner's announced intention to cancel the agreement of May 5, 1941, in accordance with the provisions of paragraph 6 thereof and Stuart's position that cancellation was to be made under the provisions of paragraph 19 thereof, along with the other evidence bearing on the matter, we are unable to find, as petitioner would have us do, that no amount was paid to it for the cancellation of the agreement. Allowing for differences *136 of opinion respecting legal draftsmanship, no explanation is offered as to why, if the $200,000 was paid for "The Stuart Formula" trade-mark alone, as petitioner contends, the agreement of November 28, 1942, dealt so fully with the cancellation of the agreement of May 5, 1941, and the settlement of all claims with respect thereto. The respondent has determined that $75,000 of the amount received by petitioner was for the cancellation of the agreement of May 5, 1941. Although the agreement of November 28, 1942, contains no allocation of the consideration recited therein, it shows that thereunder Stuart became unconditionally liable to pay petitioner $75,000. Of the additional consideration of $125,000 ($2,300 of which had been paid), $122,700 was to be paid by Stuart "on a royalty basis" and was payable only with respect to Stuart's sales of vitamin products. Negotiations leading up to the agreement of November 28, 1942, were conducted on behalf of petitioner and of Stuart by their respective attorneys who participated in the preparation of the agreement. Neither of the attorneys was offered as a witness and we do not have their testimony respecting the negotiations or in explanation *137 of the reason or reasons for any portion of the agreement. In the absence of evidence showing that the respondent's determination in this respect is erroneous, his action is sustained. See Stuart Co. v. Commissioner, 195 Fed. (2d) 176. Since the $75,000 was received by petitioner for the cancellation of its contract with Stuart, the amount is taxable as ordinary income. Roscoe v. Commissioner, 215 Fed. (2d) 478 (C.A. 5, Sept. 3, 1954); Commissioner v. Starr Bros., Inc., 204 Fed. (2d) 673. Issue 4. Respondent's determination that payments the Stuart Company was obligated to make to petitioner were to be regarded as income to petitioner for the taxable year 1943 On brief the petitioner states that no relief is now sought with respect to this issue and it need not be decided. Since the petitioner has abandoned the issue, the respondent's action with respect thereto is sustained. Issue 5. Addition to tax for failure to file a timely excess profits tax return Findings of Fact On January 15, 1944, the petitioner filed its corporation income and declared value excess profits tax return (Form 1120) for the taxable year 1943. Because said *138 return showed an excess profits net loss for the year, the petitioner did not file at that time any excess profits tax return (Form 1121) for the year. On June 20, 1946, and after an internal revenue agent had investigated the petitioner's tax liability for the year and concluded that an excess profits tax was due, the petitioner filed an excess profits tax return (Form 1121) reporting an excess profits net loss for the year. The petitioner's returns were prepared by Mac Rosen, a certified public accountant, who had been practicing since about 1938 and who had been engaged by petitioner since June 1941 to handle its accounting and tax matters. The petitioner acted in good faith in relying on Rosen to prepare the returns required of it and its failure to file a timely excess profits tax return (Form 1121) for the taxable year 1943 was due to reasonable cause. Opinion Relying on Chas. Schaefer & Son, Inc., 20 T.C. 558, the respondent contends that the petitioner has not shown a reasonable cause for its failure to file a timely excess profits tax return. The evidence shows that since June 1941 the petitioner has engaged a certified public accountant, who has been practicing *139 since 1938, to handle its accounting and tax matters and that petitioner relied on him to prepare the returns required of it for the year in question. No such situation existed in the Schaefer case. There no evidence whatever was offered to show reasonable cause for failure to file the required return. No expert advice was sought and apparently the failure to file was due to "The mere belief that a return was unnecessary, entertained by a layman without seeking any assistance in reaching his conclusion." From the facts shown, we have concluded and found that petitioner's failure to file the controverted return was due to reasonable cause. Brockman Building Corporation, Inc., 21 T.C. 175. The respondent's determination of the addition to tax is not sustained. Decision will be entered under Rule 50. Footnotes
1. Wife of M. H. Lewis.↩
1. This item was entered on petitioner's books as "10% of receipts from Stuart formula" and appears to have been an amount voted to Lewis by the petitioner's directors as a commission on the sale of "The Stuart Formula" trade-mark.↩
1. Termination of Stuart's relationship with petitioner occurred approximately four months prior to the end of this fiscal year.↩